**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

ADVANCE LOCAL MEDIA LLC, ADVANCE
MAGAZINE PUBLISHERS INC. D/B/A
CONDE NAST, THE ATLANTIC MONTHLY
GROUP LLC, FORBES MEDIA LLC,
GUARDIAN NEWS & MEDIA LIMITED,
INSIDER, INC., LOS ANGELES TIMES
COMMUNICATIONS LLC, THE
MCCLATCHY COMPANY, LLC, NEWSDAY,
LLC, PLAIN DEALER PUBLISHING CO.,
POLITICO LLC, THE REPUBLICAN
COMPANY, TORONTO STAR NEWSPAPERS
LIMITED, AND VOX MEDIA, LLC,

      Plaintiffs,

v.

COHERE INC.,

      Defendant.

Civil Action No. 1:25-cv-01305-CM

**DEFENDANT COHERE INC.'S MEMORANDUM
<ins>IN SUPPORT OF PARTIAL MOTION TO DISMISS THE COMPLAINT</ins>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................. 4

    A.    Cohere Brings AI Solutions To Enterprise Customers .......................................... 4

    B.    Plaintiffs Sue Cohere ......................................................................................... 6

    C.    The Complaint Alleges No Instance Of An Actual Cohere User Interacting
        With Plaintiffs' Works ......................................................................................... 7

ARGUMENT ...................................................................................................................... 8

I.      PLAINTIFFS FAIL TO STATE A CLAIM FOR SECONDARY COPYRIGHT
        LIABILITY (COUNT II) ................................................................................... 8

    A.    Plaintiffs' Vicarious And Contributory Infringement Theories Fail
        Because They Do Not Plausibly Allege User Direct Infringement ...................... 9

    B.    Both Of Plaintiffs' Contributory Infringement Theories Also Fail Because
        Plaintiffs Do Not Allege Knowledge Of Direct Infringement ........................... 12

    C.    Plaintiffs' Theory Of Contributory Infringement Via Inducement Fails For
        Lack Of Affirmative Encouragement ................................................................ 14

II.    PLAINTIFFS FAIL TO ALLEGE DIRECT COPYRIGHT INFRINGEMENT
        THROUGH "SUBSTITUTIVE SUMMARIES" (COUNT I) ............................... 15

III.   PLAINTIFFS FAIL TO STATE TRADEMARK CLAIMS (COUNT III & IV) ........... 17

    A.    Plaintiffs Fail To Allege Use Of Their Marks In Commerce ............................. 18

    B.    Plaintiffs Fail To Allege A Plausible Likelihood Of Consumer Confusion ........ 21

    C.    Any Use Of the Marks Was Nominative Fair Use ........................................... 23

CONCLUSION ................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. JAND, Inc.*,
    119 F.4th 234 (2d Cir. 2024) ...............................................................................18

*1-800 Contacts, Inc. v. WhenU.Com, Inc.*,
    414 F.3d 400 (2d Cir. 2005)...............................................................................20

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..........................................................................................8, 9

*Baiul v. NBCUniversal Media, LLC*,
    Nos. 13-CV-2205, 13-CV-2208, 2014 WL 1651943 (S.D.N.Y. Apr. 24, 2014)....................21

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
    881 F.3d 293 (4th Cir. 2018) .............................................................................12

*Brennan's Inc. v. Brennan's Restaurant, L.L.C.*,
    360 F.3d 125 (2d Cir. 2004)...............................................................................22

*Champion v. Moda Operandi, Inc.*,
    561 F. Supp. 3d 419 (S.D.N.Y. 2021)...............................................................20, 21

*Chanel, Inc. v. RealReal, Inc.*,
    449 F. Supp. 3d 422 (S.D.N.Y. 2020)................................................................25

*Dastar Corp. v. Twentieth Cent. Fox Film Corp.*,
    539 U.S. 23 (2003)............................................................................................18

*DFO Glob. Performance Com. Ltd. (Nevada) v. Nirmel*,
    No. 20-CV-6093, 2021 WL 3475596 (S.D.N.Y. Aug. 6, 2021)............................21

*DiFolco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010)...............................................................................4

*Eldred v. Ashcroft*,
    537 U.S. 186 (2003)..........................................................................................15

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
    844 F.3d 79 (2d Cir. 2016)...............................................................................13, 14

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)..........................................................................................16

*Franklin v. X Gear 101, LLC*,
　No. 17-CV-6452, 2018 WL 3528731 (S.D.N.Y. July 23, 2018) ...........................................21

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
　443 F.2d 1159 (2d Cir. 1971) ............................................................................................8, 12

*Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*,
　823 F.3d 153 (2d Cir. 2016) ....................................................................................................24

*Kelly-Brown v. Winfrey*,
　717 F.3d 295 (2d Cir. 2013) ....................................................................................................19

*Lang v. Ret. Living Publ'g Co.*,
　949 F.2d 576 (2d Cir. 1991) ....................................................................................................23

*Lopez v. Bonanza.com, Inc.*,
　No. 17-CV-8493, 2019 WL 5199431 (S.D.N.Y. Sept. 30, 2019)...........................................21

*Luvdarts, LLC v. AT&T Mobility, LLC*,
　710 F.3d 1068 (9th Cir. 2013) ................................................................................................12

*Matthew Bender & Co. v. W. Publ'g Co.*,
　158 F.3d 693 (2d Cir. 1998)...........................................................................................8, 10, 12

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
　545 U.S. 913 (2005).............................................................................................................12, 14

*New York Times Co. v. Microsoft Corp.*,
　No. 1:23-CV-11195 (SHS), 2025 WL 1009179 (S.D.N.Y. Apr. 4, 2025) ............11, 13, 15, 17

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
　166 F.3d 65 (2d Cir. 1999)...........................................................................................15, 16, 17

*OffWhite Prods., LLC v. Off-White LLC*,
　480 F. Supp. 3d 558 (S.D.N.Y. 2020).............................................................................19, 22

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
　602 F.3d 57 (2d Cir. 2010)......................................................................................................15

*Portkey Techs. Pte Ltd. v. Venkateswaran*,
　No. 23-CV-5074 (JPO), 2024 WL 3487735 (S.D.N.Y. July 19, 2024)...................................23

*Rescuecom Corp. v. Google Inc.*,
　562 F.3d 123 (2d Cir. 2009)....................................................................................................18

*Savin Corp. v. Savin Grp.*,
　391 F.3d 439 (2d Cir. 2004)................................................................................................21, 22

*Singleton El Bey v. Doe*,
    No. 24-CV-2207, 2024 WL 1555660 (S.D.N.Y. Apr. 10, 2024) .............................................8

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)...........................................................................................................13

*Star Indus., Inc. v. Bacardi & Co.*,
    412 F.3d 373 (2d Cir. 2005).....................................................................................21, 22, 23

*Streetwise Maps, Inc. v. VanDam, Inc.*,
    159 F.3d 739 (2d Cir. 1998)...............................................................................................22

*Tiffany (NJ) Inc. v. eBay Inc.*,
    600 F.3d 93 (2d Cir. 2010)..................................................................................................23

*Tremblay v. OpenAI, Inc.*,
    716 F. Supp. 3d 772 (N.D. Cal. 2024) ..................................................................................9

*U.S. Naval Inst. v. Charter Commc'ns, Inc.*,
    936 F.2d 692 (2d Cir. 1991)...............................................................................................10

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    676 F.3d 19 (2d Cir. 2012).................................................................................................12

**Statutes**

15 U.S.C. § 1127....................................................................................................................19, 20

17 U.S.C. § 102(b) ........................................................................................................................15

17 U.S.C. § 512(c) ........................................................................................................................12

Lanham Act § 32, 15 U.S.C. § 1124.............................................................................................18

Lanham Act § 43(a), 15 U.S.C. § 1125(a) ...................................................................................18

**Other Authorities**

First Am. Compl., *New York Times Co. v. Microsoft Corp.*, No. 1:23-CV-11195,
    ECF No. 170 (S.D.N.Y Aug. 12, 2024)..............................................................................11

*The Cohere AI App Is Available in Slack*, Cohere (Sept. 16, 2024),
    https://cohere.com/blog/slack-cohere-ai-app .......................................................................5

*Cohere Inc. Terms of Use*, Cohere, https://cohere.com/terms-of-use (last revised
    Sept. 7, 2022)........................................................................................................................7

*Cohere's Ivan Zhang on Foundation Models, RAG, and Feedback Loops*,
    Madrona (Aug. 22, 2023), https://www.madrona.com/cohere-ivan-zhang ............................5

Compl., *Daily News, LP v. Microsoft Corp.*, No. 1:24-CV-3285, ECF No. 1
(S.D.N.Y. Apr. 30, 2024) ......................................................................................11

*Introducing Chat with Retrieval-Augmented Generation (RAG)*, Cohere (Sept. 28,
2023), https://cohere.com/blog/chat-with-rag ............................................4, 5, 6, 7

*Introducing Coral, the Knowledge Assistant for Enterprises*, Cohere (July 25,
2023), https://cohere.com/blog/introducing-coral ............................................5, 6

Kyle Wiggers, *OpenAI Rival Cohere Launches Language Model API*,
VentureBeat (Nov. 15, 2021), https://venturebeat.com/uncategorized/openai-
rival-cohere-launches-language-model-api...................................................................5

Nilay Patel, *AI Will Make Money Sooner Than You'd Think, Says Cohere CEO
Aidan Gomez,* The Verge (June 10, 2024, 10:30 AM EDT),
https://www.theverge.com/24173858/ai-cohere-aidan-gomez-money-revenue-
llm-transformers-enterprise-stochastic-parrot.........................................................4, 5

Order, *Concord Music Grp., Inc. v. Anthropic PBC*, No. 5:24-CV-3811, ECF No.
322 (N.D. Cal. Mar. 26, 2025) ...................................................................9, 10, 14

## PRELIMINARY STATEMENT

Plaintiffs style this case as the latest in a string of lawsuits accusing an AI company of enabling the public to infringe copyrights. But Defendant Cohere Inc. is a different kind of AI company, so Plaintiffs' copycat claims fall flat. Other AI companies market conversational chatbots to hundreds of millions of users. Cohere specializes in privately deployed, business-focused (or "enterprise") AI solutions that allow companies to work smarter, faster, and better. Other companies' AI tools are used for everything from homework help, to fan fiction, to travel itineraries, to product reviews. Cohere's customers use Cohere's solutions at work, to search their own proprietary data, to translate documents into different languages, to monitor internal compliance, or to manage projects. That is why not a single thing in Plaintiffs' lengthy Complaint suggests that any real customer of Cohere ever has—or even *would*—use Cohere's solutions to infringe Plaintiffs' copyrights.

The technology at the core of this case is the groundbreaking advance known as the large language model, or LLM. LLMs are built by training a machine learning algorithm on vast quantities of varied text. The aim is not to copy the expression from any *particular* text, but to discern linguistic and informational patterns across *all* text. To do this, the model breaks text into (usually) four-character packets called "tokens," then derives and encodes statistical relationships between those tokens. The resulting "parameters," which typically number in the billions, allow the LLM to respond to user prompts by predicting the sequence of tokens that best follows the user's direction. Cohere—like OpenAI, Anthropic, and a handful of others—develops its flagship "Command" LLMs in this way. But an LLM is a *technology*, not a *product*. And different AI companies have chosen to build different types of products and tools atop LLM technology, and to offer them to different markets.

Plaintiffs, who publish journalism, advance claims attacking both the models and the products Cohere has built. With respect to the models, Plaintiffs allege that Cohere violated their copyrights by including their works in the training set for Cohere's "Command" series of LLMs. This LLM-training theory ultimately turns on the defense of copyright fair use, a fact-bound issue that is being resolved in generative AI litigation across the country, and that Cohere will advance on summary judgment on a full factual record.

This motion addresses Plaintiffs' second type of claim, based on alleged *outputs* of Cohere's AI tools returned in response to user prompts. But let it be clear: The Complaint offers a deafening nothing about *real-world* users, *real-world* prompts, or *real-world* outputs. Not a single allegation addresses what actual Cohere enterprise users have done or would do in real life. Instead Plaintiffs appear to have deliberately *misused* Cohere demo tools to try to manufacture a case. Plaintiffs evidently entered their own stylized prompts to get the demo tools to elicit small portions, summaries, or inaccuracies about their own works. Plaintiffs say the outputs they generated violate copyright and trademark law. But to even elicit what they complain of, Plaintiffs would have had to agree to Cohere's Terms of Service *barring* the very uses they made—including prohibitions on non-business uses or those that might infringe intellectual property rights. And nowhere do Plaintiffs even attempt to explain why any real Cohere user would prompt any Cohere tool the way Plaintiffs did. The entire outputs case is a cynical, Plaintiff-crafted hypothetical.

This basic failing dooms several of Plaintiffs' claims.

First, the Complaint fails to state a claim for secondary copyright liability, under either a theory of vicarious or contributory infringement. That is because Plaintiffs have not adequately alleged any actual instance of *direct* infringement, which is a necessary precondition for any

possible *indirect* liability by Cohere. And even if they could allege such instances, Plaintiffs have failed to allege that Cohere bears any culpability for end-user behavior, whether through specific knowledge of acts of infringement or direct encouragement of those acts. *Infra* § I.

Second, the Complaint fails to state a claim for direct infringement under a theory of "substitutive summaries"—that is, based on hypothetical model outputs that summarize Plaintiffs' works. Summarizing is not infringement, especially when the summaries relay unprotected facts, not Plaintiffs' original expression, as is the case here. *Infra* § II.

Third, the Complaint fails to state claims for trademark infringement for multiple independent reasons. A trademark claim requires plausible allegations that a defendant used plaintiff's marks "in commerce" in a way that caused likely confusion as to the source of a product or service in the minds of an appreciable number of consumers. Again, Plaintiffs do not plausibly allege that *any* consumer, let alone an appreciable number of them, has been exposed to any output (whether confusing or not). But even if the purported examples Plaintiffs themselves allegedly elicited from Cohere's products had been seen by real consumers, they would not support a claim. These one-off uses of the marks (i) are not uses "in commerce," (ii) could never even reach, let alone confuse, an "appreciable number" of users, and (iii) in all events represent "nominative" fair use—the basic right to reference a source for purposes of identifying it. *Infra* § III.

Claims must be based on plausible allegations against the defendant, not hypotheticals that sound like other cases against other companies. This Court should grant this Motion and narrow this case to the important issue of whether Cohere's training of its models is a fair use.

## BACKGROUND

A.    **Cohere Brings AI Solutions To Enterprise Customers**.

Cohere is not an "[o]rdinary" AI company. Compl. ¶ 3 (citation omitted).[1] Unlike companies such as OpenAI, Cohere does not make consumer products; it is focused on the enterprise market and making AI solutions for companies. Compl. ¶ 65.[2] Cohere builds these products on top of its flagship LLM, Command. Compl. ¶ 4.[3]

One of the advances that makes Cohere's products so useful to businesses is a function called Retrieval Augmented Generation, or RAG. Patel, *supra* n.2. In simple terms, RAG is like giving an LLM the ability to search for and rely upon new information to craft its response. *Id.* Without it, an LLM will respond to a user query based only on the patterns it discerned from the original training dataset. Compl. ¶¶ 4, 73. But with RAG, the LLM can "ground" its answers on other, often more relevant sources from an additional dataset—anything from internal company policies, to a retailer's product inventory, to a repository of bench memos. Compl. ¶¶ 4, 65, 75; Patel, *supra* n.2; *Introducing Chat with RAG*, *supra* n.3. Cohere specializes in developing privately deployed, enterprise AI solutions that leverage this technology to help businesses with

---

[1] This background relies on the allegations in the Complaint and, for necessary context, the sources Plaintiffs "incorporated by reference" or otherwise "render[ed]…'integral' to the complaint" by citing. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

[2] Nilay Patel, *AI Will Make Money Sooner Than You'd Think, Says Cohere CEO Aidan Gomez,* The Verge (June 10, 2024, 10:30 AM EDT), https://www.theverge.com/24173858/ai-cohere-aidan-gomez-money-revenue-llm-transformers-enterprise-stochastic-parrot (cited in Compl. ¶ 6).

[3] *Introducing Chat with Retrieval-Augmented Generation (RAG)*, Cohere (Sept. 28, 2023), https://cohere.com/blog/chat-with-rag ("*Introducing Chat with RAG*") (cited in Compl. ¶ 4).

tasks like tracking spending, analyzing trends, generating documents, or providing customer support.[4] *See* Compl. ¶ 77.

To show prospective business customers and software developers what Cohere's tools can do, Cohere offers a "product demo" on its website called Playground. Compl. ¶ 69. Playground is not itself a Cohere product. As its functionality makes plain, it is geared toward technical users to preview Cohere's RAG capabilities, Compl. ¶ 81, like demonstrating use of RAG "connectors." *Introducing Chat with RAG*, *supra* n.3. Connectors are the method by which a developer would connect Cohere's tools to a data source for grounding—for example, whether it is the company database connector or an internet search connector. Compl. ¶¶ 69, 75, 79-80; *Introducing Chat with RAG*, *supra* n.3. The Playground included an "Under the Hood" feature that allows a developer to see the underlying software code that demonstrates how Command grounds on particular data when using RAG functions. Compl. ¶ 80. This illustration is important to Cohere's risk-averse customer base, Patel, *supra* n.2, because it demonstrates RAG's accuracy and reliability. *Introducing Chat with RAG*, *supra* n.3.[5]

Cohere's RAG functionality and connectors are integrated aspects of "business-grade" solutions that can also contain "conversational agents" or "chatbots." Compl. ¶¶ 4, 61.[6] Distinct from standalone "consumer" or general-public chatbots, Cohere's "enterprise-grade" solutions

---

[4] *Cohere's Ivan Zhang on Foundation Models, RAG, and Feedback Loops*, Madrona (Aug. 22, 2023), https://www.madrona.com/cohere-ivan-zhang (cited in Compl. ¶ 77); Kyle Wiggers, *OpenAI Rival Cohere Launches Language Model API*, VentureBeat (Nov. 15, 2021), https://venturebeat.com/uncategorized/openai-rival-cohere-launches-language-model-api (cited in Compl. ¶ 83).

[5] *The Cohere AI App Is Available in Slack*, Cohere (Sept. 16, 2024), https://cohere.com/blog/slack-cohere-ai-app (cited in Compl. ¶ 8).

[6] *Introducing Coral, the Knowledge Assistant for Enterprises*, Cohere (July 25, 2023), https://cohere.com/blog/introducing-coral ("*Introducing Coral*") (cited in Compl. ¶ 66).

are customized for companies. *Introducing Chat with RAG*, *supra* n.2; *Introducing Coral*, *supra* n.6. These tailored tools know the customer's business, use the company's own data, and help workers complete their business tasks in a private, secure environment. *Introducing Chat with RAG*, *supra* n.3; *Introducing Coral*, *supra* n.6. Indeed, Cohere's customers select the RAG connectors they wish to use, and can even configure their own. *Introducing Chat with RAG*, *supra* n.3.

### B.    Plaintiffs Sue Cohere.

Plaintiffs are large publishers of news, magazine, and digital media. Compl. ¶ 1. They brought this lawsuit alleging that Cohere (and its users) have infringed their copyrights and trademarks through development and use of Cohere's models and products.

The first count alleges that Cohere directly infringes by training its LLM on Plaintiffs' works; making copies of those works in the demo environments; and delivering outputs that are "verbatim copies," "substantial excerpts," or "substitutive summaries" (i.e., "[p]araphrasing") of the works. Compl. ¶¶ 4, 82, 134, Ex. B. This Motion addresses the "substitutive summaries" theory of direct infringement. According to that theory, Cohere is liable for providing "a summary about a topic" that draws on Plaintiffs' works. Compl. ¶ 101.

The second count posits, "in the alternative," that if a user's prompt causes Cohere's models or products to reproduce Plaintiffs' works, it is the user, not Cohere, that has committed direct infringement, and Cohere is *secondarily* liable for that conduct. Compl. ¶¶ 141-142. Plaintiffs allege three theories of secondary liability: "contributory infringement by material contribution, contributory infringement by inducement, and vicarious infringement." Compl. ¶ 141.

Plaintiffs' third and fourth claims allege trademark infringement under the Lanham Act. The Complaint alleges that "[i]f a user asks Cohere for a copy of an article with the RAG feature

turned off, Cohere will often hallucinate an answer." Compl. ¶ 118. ("Hallucination" is a term

used to describe when an LLM provides incorrect information.) Plaintiffs say that this

hallucination could lead to "confusion, mistake, or deception as to whether the hallucinated

articles Cohere provides are associated or affiliated with, or are sponsored, endorsed, or

approved [by] Publishers." Compl. ¶¶ 155-156 (Count III); *see* Compl. ¶¶ 163-164 (Count IV).

### C.    The Complaint Alleges No Instance Of An Actual Cohere User Interacting With Plaintiffs' Works.

Much of the Complaint is predicated on the supposedly infringing outputs Cohere's tools

generate. *See, e.g.*, Compl. ¶ 134; Compl. Ex. B (giving examples of allegedly infringing

outputs). Yet the Complaint never alleges that any actual Cohere user has ever elicited infringing

outputs in the real world. Rather, all of the accused outputs have apparently been generated by

Plaintiffs (or someone working on their behalf) using the Playground interface—the "product

demo" meant for "more technical users" that previews for developers the products' business-

focused capabilities. Compl. ¶¶ 69, 79-80; *Introducing Chat with RAG*, *supra* n.3. And indeed,

the Complaint acknowledges that Cohere's users agree to terms of service that "prohibit

Cohere's services from being used" for various purposes. Compl. ¶ 78. Specifically, users

"acknowledge and agree that the Cohere Solution has been designed for business use and you

represent and warrant to and covenant with Cohere that you will not use the Cohere Solution for

personal, family or household purposes."[7]

The Complaint similarly never alleges that Cohere users have ever been exposed to any

output that references Plaintiffs' trademarks—let alone points to such a real-world output

delivered to some appreciable segment of the public. Every example of use of Cohere's Chat

---

[7] *Cohere Inc. Terms of Use*, Cohere, https://cohere.com/terms-of-use (indicating that terms were last revised Sept. 7, 2022).

demo environment in connection with the alleged trademark infringement is strikingly impersonal and does not indicate who prompted the model at all. *See*, *e.g.*, Compl. ¶ 118 ("Users may choose to use Command without RAG …"); ¶ 119 ("[W]hen prompted for this piece with RAG turned off, Cohere …"); Compl. Ex. D (giving examples of allegedly infringing outputs but providing no details on who prompted those outputs).

## ARGUMENT

When "there is no factual predicate or legal theory on which Plaintiff[s] may rely to state a claim, the [claim] is based on an indisputably meritless legal theory" and must be dismissed. *Singleton El Bey v. Doe*, No. 24-CV-2207, 2024 WL 1555660, at *3 (S.D.N.Y. Apr. 10, 2024). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs' secondary copyright infringement claims (Count II), one of Plaintiffs' theories of direct copyright liability (part of Count I), and Plaintiffs' trademark infringement claims (Counts III and IV) all fall short and should be dismissed.

## I.    PLAINTIFFS FAIL TO STATE A CLAIM FOR SECONDARY COPYRIGHT LIABILITY (COUNT II).

"For a defendant to be held contributorily or vicariously liable, a direct infringement must have occurred." *Matthew Bender & Co. v. W. Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998) (quoting treatise). "[A] person who has promoted or induced the infringing acts of" another is "liable as a 'vicarious' infringer." *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971). Similarly, and again "[a]ssuming there is a class of primary infringers, then a party 'who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another, may be held liable as a contributory infringer.'" *Matthew Bender*, 158 F.3d at 706 (quoting *Gershwin*, 443 F.2d at 1162).

Count II of the Complaint alleges that by offering models and products Cohere knows are capable of generating "verbatim copies, substantial excerpts, and substitutive summaries" of Plaintiffs' works, Cohere is secondarily liable under each of three theories: vicarious infringement, contributory infringement via material contribution, and contributory infringement via inducement. Compl. ¶¶ 140-152. Plaintiffs fail to state a claim for secondary liability under any of these theories. First, all three theories fail because Plaintiffs do not adequately allege any instance of direct infringement by Cohere's users. *Infra* § I.A. Second, Plaintiffs' two theories of contributory infringement independently fail because Plaintiffs do not allege that Cohere had actual knowledge of any specific infringement by users. *Infra* § I.B. Third, Plaintiffs' theory of contributory infringement via inducement separately fails because Plaintiffs offer only threadbare, conclusory allegations of inducement. *Infra* § I.C.

### A. Plaintiffs' Vicarious And Contributory Infringement Theories Fail Because They Do Not Plausibly Allege User Direct Infringement.

Plaintiffs have not adequately alleged that any customer has ever actually used Cohere's tools to generate an infringing output. The Complaint's unadorned allegation that "[u]sers and licensees" have engaged in "ongoing … direct infringement," Compl. ¶ 142, is just the sort of "[t]hreadbare recital[] of the elements of a cause action" that "do[es] not suffice." *Iqbal*, 556 U.S. at 678. Count II must therefore be dismissed in its entirety. *See* Order, *Concord Music Group, Inc. v. Anthropic PBC*, No. 5:24-CV-3811, ECF No. 322, at 5, 8 (N.D. Cal. Mar. 26, 2025) (dismissing contributory and vicarious infringement claims because plaintiffs failed to allege the necessary predicate act of direct infringement by a third party) ("*Concord* Order," attached as Hosp Decl. Ex. A); *Tremblay v. OpenAI, Inc.*, 716 F. Supp. 3d 772, 777-78 (N.D. Cal. 2024) (same as to vicarious infringement claim).

To be sure, Plaintiffs offer many examples of allegedly infringing outputs. *See* Compl. Ex. B. But those are all instances of Plaintiffs themselves engineering the outputs. In theory, that might suffice if the way Plaintiffs used Cohere's tools reflected the way real users might do so. But Plaintiffs' uses deliberately ignore limitations in Cohere's Terms of Service, and Plaintiffs do not even attempt to allege that the example outputs in the Complaint are the result of intended, ordinary, permissible, or plausible use by real users. Quite the opposite, the Complaint obscures the nature of their uses with careful phrasing that never identifies the actual user. *See, e.g.*, Compl. ¶ 9 (referring to "specific examples of copyright-infringing outputs that Cohere provides"); Compl. ¶¶ 81, 92, 99, 101, 115 (referring vaguely to a "request" for copyrighted work); Compl. ¶¶ 94, 95 (describing outputs generated "when asked"); Compl. Ex. B, Example No. 4 ("Give me the article Cyndi Lauper to perform in Portland Nov 30, get tickets for less than $35 published by The Oregonian/OregonLive.").

Nor can Plaintiffs themselves be the direct infringers, for "[i]t is elementary that the lawful owner of a copyright is incapable of infringing a copyright interest that is owned by him." *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 695 (2d Cir. 1991) (citation omitted); *see Matthew Bender*, 158 F.3d at 706 (affirming dismissal of contributory infringement claim where plaintiff "has failed to identify any primary infringer, other than … [plaintiff's] counsel"). And even if it were not obvious that it was Plaintiffs (or their agents) who generated the outputs, the ambiguity itself renders the allegations of direct infringement insufficient. Indeed, the court in a similar case dismissed secondary liability claims against an AI company where "[n]one of the allegations in the complaint indicate *who* submitted the prompts that resulted in infringing outputs." *Concord* Order 6 (emphasis added).

Though courts in some cases involving LLMs have allowed secondary infringement claims past the pleading stage, those cases all have a key feature this case lacks: allegations of widespread *consumer* use of the LLM-based product.[8] For instance, in finding it plausible that users of OpenAI's ChatGPT product had used the popular chatbot to infringe, the court pointed to the complaint's allegations of "'widely publicized' instances of copyright infringement by end users of defendants' products." *New York Times Co. v. Microsoft Corp.*, No. 1:23-CV-11195 (SHS), 2025 WL 1009179, at *10 (S.D.N.Y. Apr. 4, 2025). There are no "widely publicized instances" in this case. Nor would such allegations be plausible, because the Complaint does not and cannot allege that Cohere's products are used by the public in the ways members of the public tend to use chatbots. The chat feature Plaintiffs used to engineer allegedly infringing outputs is not a general-purpose consumer chatbot; the Complaint readily acknowledges that it is an enterprise chatbot in a "product demo" designed to show developers how Cohere's business applications work, Compl. ¶¶ 69, 79-81; *supra* 5. The Complaint likewise acknowledges Cohere's terms of use that prohibit use of Cohere's solutions for "personal" or other non-"business use." *Supra* 7.

In short, to generate the supposedly infringing outputs, Plaintiffs' investigators had to breach those terms of service, using Cohere's solutions for the decidedly self-interested, non-business purpose of ginning up litigation. It is utterly implausible that any bona fide user would

---

[8] *See, e.g.*, First Am. Compl., *New York Times Co. v. Microsoft Corp.*, No. 1:23-CV-11195, ECF No. 170, ¶¶ 61-62 (S.D.N.Y Aug. 12, 2024) (alleging that ChatGPT's "chatbot," which is "targeted to both ordinary consumers and businesses," "was an instant viral sensation, reaching one million users within a month of its release and gaining over 100 million users within three months"); *id.* at ¶ 126 (alleging "many" "widely publicized" "examples" of copyright infringement after "ChatGPT, Browse with Bing, and Bing Chat were released" to the public); Compl., *Daily News, LP v. Microsoft Corp.*, No. 1:24-CV-3285, ECF No. 1, ¶¶ 58-59, 141, 145-46 (S.D.N.Y. Apr. 30, 2024) (similar).

do the same. And so Plaintiffs cannot draw from their own idiosyncratic uses a fair inference that any actual users would infringe their copyrights via Cohere's tools. Without alleged instances of actual direct infringement, Plaintiffs can only "hypothesiz[e] that users" could infringe, and that is not good enough. *Matthew Bender*, 158 F.3d at 706.

### B.    Both Of Plaintiffs' Contributory Infringement Theories Also Fail Because Plaintiffs Do Not Allege Knowledge Of Direct Infringement.

Plaintiffs' two contributory infringement theories fail for the additional reason that Plaintiffs have not adequately alleged that Cohere had "knowledge of the infringing activity" of its end users. *Gershwin*, 443 F.2d at 1162. Plaintiffs thus fail to allege the sort of "purposeful, culpable expression and conduct" required for secondary liability. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 937 (2005).

To make out a claim of contributory infringement, a plaintiff must allege "actual knowledge of specific acts of infringement," or the legal equivalent of actual knowledge— "[w]illful blindness" of those "specific facts." *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072-73 (9th Cir. 2013); *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 308 (4th Cir. 2018). Merely alleging that the defendant "should have known" of infringement is insufficient. *BMG*, 881 F.3d 308-10 (relying on "the Second Circuit's widely-cited *Gershwin* decision" for actual knowledge standard); *see Matthew Bender*, 158 F.3d at 707 n.23 ("no showing of knowledge has been made" based on manipulation of defendant's product to produce infringement); *cf. Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 32 (2d Cir. 2012) (knowledge under safe harbor provision of DMCA, 17 U.S.C. § 512(c), requires "awareness of facts or circumstances that indicate specific and identifiable instances of infringement"). And even where courts have accepted a form of constructive knowledge, they have made clear that

"'more than a generalized knowledge … of the possibility of infringement' is required." *New York Times*, 2025 WL 1009179, at *9 (citation and alteration omitted).

Here, the Complaint includes at most a conclusory statement of Cohere's generalized "knowledge of the direct infringements of [their] works by Cohere's licensees and users." Compl. ¶ 143. This purported knowledge is not about specific instances of infringement. Indeed, it is not even a specific, plausible allegation of Cohere's knowledge of *types* of behaviors actual users commonly engage in. It is based merely on Plaintiffs' *also* conclusory claim about what Cohere designed its products to be able to do. *See id.* ("Cohere knowingly trains Command on unauthorized copies of Publishers' works and operates its service to make copies of [Plaintiffs'] works."); *see* Compl. ¶ 93 ("Cohere knows that its Command-model-based Chat service generates and delivers copies of Publishers' works to end users, because Cohere, contrary to its own policies against infringement, programmed its system to do exactly that."); Compl. ¶ 112 (similar with respect to "substitutive summaries").

Again, where courts have allowed contributory infringement claims based on the use of LLM-based products to move forward, they have demanded more than the mere suggestion of what an LLM is *capable* of doing. *See New York Times*, 2025 WL 1009179, at *10 (allowing claim to proceed where "Plaintiffs allege that defendants possessed far more than a 'generalized knowledge of the possibility' of third-party infringement") (citation omitted). That is a must, because the Supreme Court has made clear that "when a product is capable of 'substantial noninfringing uses,'"—as any product that can generate new natural language outputs is—"its manufacturer cannot be liable simply for knowing that the product *could be used* in a way that would constitute infringement." *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 100 (2d Cir. 2016) (emphasis added) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*,

464 U.S. 417, 456 (1984)); *see Grokster*, 545 U.S. at 934-35 (similar). And that is why courts readily dismiss claims at the pleading stage where plaintiffs include only generalized allegations of knowledge that "are conclusory at best." *Concord* Order 7 (rejecting as insufficient allegation that defendant "knowingly trained its AI models on infringing content on a massive scale in order to enable those models to generate responses to user prompts that infringe Publishers' copyrighted lyrics"). The case for dismissal is particularly strong here where even what the model is capable of doing is bounded by its private, business deployments.

### C.    Plaintiffs' Theory Of Contributory Infringement Via Inducement Fails For Lack Of Affirmative Encouragement.

Plaintiffs' inducement theory of contributory infringement separately fails to state a claim for secondary liability. To be liable for inducing another's infringement, a defendant must "distribute[] a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement," such as "advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 936-37; *see EMI Christian*, 844 F.3d at 100 (upholding verdict of contributory infringement where head of company "personally encouraged his employees to" upload pirated songs for users to play).

The Complaint's allegations of inducement are wholly conclusory. Plaintiffs aver merely that "Cohere designs, operates, and maintains Command with the object of supplying copies of news and magazine articles, including full verbatim copies, substantial excerpts, and substitutive summaries of Publishers' works, and actively promotes Command as a service providing such content, inducing its users' direct infringement." Compl. ¶ 144. Entirely absent are the "active steps" necessary to prove inducement liability. *Grokster*, 545 U.S. at 936 (citation omitted).

The closest the Complaint comes to alleging that Cohere "intend[s] and encourage[s] [its] product[s] to be used to infringe," *Grokster*, 545 U.S. at 940 n.13, is stating that "Cohere has

specifically called out and emphasized Command's news reporting function," a function Cohere "marketed" with a mock prompt and a two-sentence summary of the state of the "healthcare tech industry," which (Plaintiffs say) was supported by what looks like a citation to one of Plaintiffs' articles. Compl. ¶ 66. But merely touting products as tools to stay up to date with "the latest news," Compl. ¶¶ 67-69, is not a culpable inducement to infringe. People across the world use search engines for this purpose every day. And as explained at greater length below, companies like Cohere "ha[ve] every right to republish the facts contained in [a plaintiff's] articles," and users have every right to discover that news. *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 70 (2d Cir. 1999). So the mere fact that Cohere has educated users regarding the ability to use its products to learn the news does not state a claim for inducement.

## II.    PLAINTIFFS FAIL TO ALLEGE DIRECT COPYRIGHT INFRINGEMENT THROUGH "SUBSTITUTIVE SUMMARIES" (COUNT I).

Count I should be dismissed to the extent Plaintiffs allege that Cohere is directly liable for generating "substitutive summaries" of Plaintiffs' works. Compl. ¶ 134. As another judge in this District recently recognized, this kind of "abridgment" theory of infringement fails as a matter of law where, as here, summaries are not on their face substantially similar to the plaintiffs' protected expression, either qualitatively or quantitatively. *See New York Times*, 2025 WL 1009179, at *27-28 (granting motion to dismiss); *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63-64 (2d Cir. 2010) ("[W]e have repeatedly recognized that, in certain circumstances, it is entirely appropriate for a district court to resolve that question [of substantial similarity] as a matter of law," including "when a defendant raises the question of substantial similarly at the pleadings stage on a motion to dismiss.").

Copyright protection does not extend to "every idea, theory, and fact" underlying a copyrighted work. *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003); *see* 17 U.S.C. § 102(b) (setting

15

forth the idea-expression distinction). "[C]opyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349-50 (1991). Because a defendant has "every right to republish facts contained in [a plaintiff's] articles," courts must be "discerning" in evaluating claims involving abridgements. *Nihon*, 166 F.3d at 70 (discussing "abstracts" of news articles) (citation omitted). And rightly so, for anything less would lead to the monopolization of knowledge and the impoverishing of the public domain.

Plaintiffs' allegations regarding abridgments would sweep in outputs that convey nothing but unprotected information through original expression. As Plaintiffs' Exhibit B shows, nearly all the summaries on which they predicate their claim do not copy *any* allegedly protected expression. Instead, they "incorporat[e] the abstracted facts into new and original sentences," keeping "well clear of … infringement even" assuming they "use[] nearly all of the facts contained in the corresponding article[s]." *Nihon*, 166 F.3d at 71.

Take Plaintiffs' paradigmatic example, the output discussed at paragraphs 102-105 of the Complaint. Plaintiffs criticize Cohere for "extract[ing]" from their article information about "the specifics of a new rule in Portland regarding the display of political messages, the genesis of the new rule, and the reaction of the teachers' union including the details of a grievance action." Compl. ¶ 105. But those are all facts, which even Plaintiffs acknowledge Cohere presents by "paraphrasing," not reproducing Plaintiffs' own language. Compl. ¶ 104; *see* Compl. ¶ 105 (side-by-side comparison). The rest of the output doesn't even do that—the remainder of the 1-paragraph output does not paraphrase any of the original expression in Plaintiffs' 18-paragraph-

long article. *Compare* Compl. Ex. B, Example No. 5, *with* Hosp Decl. Ex. B (original *OregonLive* article).[9]

Even where the summaries do copy some of Plaintiffs' expression, they do so only minimally, likewise rendering them noninfringing. *See Nihon*, 166 F.3d at 71 (copying "approximately twenty percent of the material in the article" is generally not substantially similar but copying "well over half of the text" usually is). Plaintiffs' second example, at paragraphs 107-110, proves as much. The output paraphrases only 14.7% of the original article, and it "verbatim" copies only 5.2% of the original. *See* Hosp Decl. Ex. C (original *Toronto Star* article). These examples are representative of the rest in Exhibit B. In all instances, the summaries—even if "detailed"—"differ in style, tone, length, and sentence structure from [Plaintiffs'] articles." *New York Times*, 2025 WL 1009179, at *27-28.

This Court should grant the Motion and make clear that Plaintiffs cannot seek discovery or otherwise continue to advance an abridgment-based theory predicated only on summaries of unprotected information from articles. And any theory of secondary liability predicated on these same summaries should be rejected for the same reason.

## III. PLAINTIFFS FAIL TO STATE TRADEMARK CLAIMS (COUNT III & IV).

Plaintiffs' trademark claims should also be dismissed. Plaintiffs are alone among challengers of LLM-based products in claiming that outputs that reference their publications constitute trademark infringement, and their theory is novel indeed. The basis of Plaintiffs' claims is the allegation that "[i]f a user asks Cohere for a copy of an article with the RAG feature turned off, Cohere will often hallucinate an answer, completely manufacturing the text of the

---

[9] Cohere has included with this Motion a more legible version of the *OregonLive* article cited at Compl. ¶ 103, as well as the *Toronto Star* article discussed below.

requested article." Compl. ¶ 118. The result, the Complaint posits, is that the model may output text or other content that it attributes to, say, the *L.A. Times* that did not in fact appear there. *Id.* Plaintiffs say that by this incorrect, one-off response to a hypothetical user request for information, Cohere "deceive[s]" users into "incorrectly believe[ing] that Cohere's hallucinated articles" come from one of their publications. Compl. ¶ 163.

The Supreme Court has cautioned against the "creat[ion of] a species of mutant copyright law" that applies trademark law to "a communicative product—one that is valued … for the intellectual content that it conveys." *Dastar Corp. v. Twentieth Cent. Fox Film Corp.*, 539 U.S. 23, 33-34 (2003). Plaintiffs nevertheless ask this Court to create a new species of misattribution law. They assert a trademark claim against a pure communicative response to a user request for information, with the alleged wrong nothing more than an error in an intended factual statement. This you-said-I-said-something-I-didn't trademark theory is as dangerous as it is wrong.

Plaintiffs' claims under § 43(a) and § 32 of the Lanham Act fail for three independent reasons. *See 1-800 Contacts, Inc. v. JAND, Inc.*, 119 F.4th 234, 246 (2d Cir. 2024) (standards for § 32 and § 43 are substantially the same). First, Plaintiffs fail to allege that the challenged uses of their marks are *in commerce*, as required in this Circuit, *id. Infra* § III.A. Second, Plaintiffs fail to plausibly allege that any use "would 'likely cause confusion' as to the origin, sponsorship, or affiliation of the defendant's goods with plaintiff's goods," *1-800 Contacts*, 119 F.4th at 246 (citation omitted). *Infra* § III.B. And third, the challenged uses of the marks are lawful as nominative fair use. *Infra* § III.C.

### A. Plaintiffs Fail To Allege Use Of Their Marks In Commerce.

"[A] complaint fails to state a claim under the Lanham Act unless it alleges that the defendant has made 'use in commerce' of the plaintiff's trademark." *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009). "[I]n determining whether the plaintiffs have satisfied the

'use in commerce' requirement, we ask whether the trademark has been displayed to consumers in connection with a commercial transaction." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 306 (2d Cir. 2013). And when considering services, "a mark shall be deemed to be in use in commerce ... on services when it is used or displayed in the *sale or advertising of services* and the services are rendered in commerce." *Id.* at 305 (emphasis added) (quoting 15 U.S.C. § 1127).

Plaintiffs come nowhere close to alleging this. To begin with, they again fail to allege any *actual* use of their marks in the real world with a real person. Plaintiffs simply provide "examples of Cohere's infringement of Publishers' trademarks" or "examples of misleading outputs" without indicating who used Cohere's service. Compl. ¶¶ 9, 121; Compl. Ex. D, Legend ("This is the text of the query posed to Cohere's Command model."). It was Plaintiffs who evidently turned off Cohere's RAG (i.e., retrieval) function, asked the model to retrieve a certain article, and got it to do so for twelve of their marks. Compl. ¶ 118; Compl. Ex. D. If this case were about a consumer-facing chatbot used by hundreds of millions of users, perhaps it would be barely plausible that some might replicate Plaintiffs' stylized conduct. But as the Complaint acknowledges, Cohere has a distinct customer base of *enterprise* users. The Complaint does nothing to render it plausible that any of Cohere's actual users, making use of Cohere's tools for enterprise tasks, have done or imminently will do what Plaintiffs have done. *See OffWhite Prods., LLC v. Off-White LLC*, 480 F. Supp. 3d 558, 566 (S.D.N.Y. 2020) (dismissing trademark infringement claims at the motion to dismiss stage because plaintiff "notably, does not allege a single instance in which a consumer evinced confusion between these products").

Even as to the twelve marks for which Plaintiffs provide an example, the uses do not qualify as commercial uses for two reasons. First, any particular output from Cohere's model is not itself a commercial product or service that is the subject of any transaction, purchasing

decision, or the like; it is the communicative output of the model's language-processing capabilities. As the Complaint recognizes, Cohere does not sell, and customers do not purchase, particular outputs, but instead buy "API access" that is output agnostic. Compl. ¶ 146. Cohere's products, in other words, are the LLM-based tools it makes for the enterprise market. So the outputs containing third-party marks are therefore not themselves used in commerce, because "[Cohere] does not 'use' [the marks] in the manner ordinarily at issue in an infringement claim: it does not 'place' [the marks] on any goods or services in order to pass them off as emanating from or authorized by [Plaintiffs]." *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 408 (2d Cir. 2005).

Second, even if an output was itself a product or service, the Complaint does not plausibly allege that Cohere uses or displays marks in that output "in the sale or advertising of [its] services." 15 U.S.C. § 1127. Plaintiffs do not allege that outputs themselves are marketing, sales, or advertising *by Cohere*. Nor could they. Again, any particular output is a one-off response generated in response to a user's query and is not shared with anyone except the user. Indeed, in Plaintiffs' examples, the outputs contain Plaintiffs' marks only because the *prompt* requested that it do so. There is no plausible reading of those outputs as an advertisement by Cohere—the model is just trying to answer the question.

Ultimately, "[t]he Lanham Act only protects the consuming public from being confused about affiliations and endorsements that might make a difference to their decision to purchase a product." *Champion v. Moda Operandi, Inc.*, 561 F. Supp. 3d 419, 433 (S.D.N.Y. 2021). That is why courts in this District routinely dismiss trademark claims when the Complaint fails to allege

the sort of "use in commerce" that might bear on such a decision.[10] Because Plaintiffs present no evidence of such use, their trademark claims should be dismissed.

### B.    Plaintiffs Fail To Allege A Plausible Likelihood Of Consumer Confusion.

Plaintiffs' claims should also be dismissed for the independent reason that Plaintiffs do not plausibly allege a likelihood of confusion. The consumer-confusion inquiry asks whether "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004) (citation omitted). Plaintiffs must prove "a probability of confusion, not a mere possibility, affecting numerous ordinary prudent purchasers." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 383 (2d Cir. 2005) (cleaned up). "In the context of a motion to dismiss, courts have disposed of trademark claims where simply looking at the work itself, and the context in which it appears, demonstrates [that confusion is] implausible." *Champion*, 561 F. Supp. 3d at 438 (citation omitted).

---

[10] *See*, *e.g.*, *Lopez v. Bonanza.com, Inc.*, No. 17-CV-8493, 2019 WL 5199431, at *10 (S.D.N.Y. Sept. 30, 2019) ("Plaintiff also does not contend that the … Defendants sold their services by use of Plaintiff's marks or that they used the marks in connection with selling or advertising their web hosting, e-commerce, or online services.") (cleaned up); *Franklin v. X Gear 101, LLC*, No. 17-CV-6452, 2018 WL 3528731, at *10 (S.D.N.Y. July 23, 2018) ("As for Instagram, the Complaint does not contend that it placed the [mark] on any clothing or other goods that it sold or that Instagram sold its photo sharing services by use of the [mark…. Similarly, the Complaint contends that GoDaddy provided 'web hosting services to X Gear 101 and Joshua Tydlacka,' but not that GoDaddy used the mark in connection with selling or advertising its web hosting services."); *DFO Glob. Performance Com. Ltd. (Nevada) v. Nirmel*, No. 20-CV-6093, 2021 WL 3475596, at *9 (S.D.N.Y. Aug. 6, 2021) ("[T]he complaint is bereft of allegations that the websites with [the mark] in the URL sold, listed, or otherwise advertised any particular product…. [T]he Court's inability to infer that the websites sold goods or services distinguishes this case from those in which courts have treated the use of a mark in a URL as a use in commerce."); *see also Baiul v. NBCUniversal Media, LLC*, Nos. 13-CV-2205, 13-CV-2208, 2014 WL 1651943, at *13 (S.D.N.Y. Apr. 24, 2014), *aff'd sub nom. Baiul v. Disson*, 607 F. App'x 18 (2d Cir. 2015) (concluding, on summary judgment, "[the website containing the mark] is not targeted to the television viewing audience, advertisers or the general public; full access to the site requires registration with United States media credentials.")

21

Again, Plaintiffs' theory is implausible on its face. Leave aside that the Complaint points to no actual instance of a real-world user being exposed to a hallucination that could even conceivably cause confusion. Even if it did, Plaintiffs do not explain how a *single* unique output responding to a *single* user's individual prompt could ever affect an "appreciable number," *Savin Corp.*, 391 F.3d at 456, or "numerous," *Star Industries*, 412 F.3d at 383, ordinary users. Nor do they include any allegation that would suggest some repetition or aggregation of uses of their marks across outputs in some similar way so as to affect a meaningful segment of consumers.

The Complaint also lacks allegations leading to the plausible inference that the user of Cohere's products, viewing the marks in the context in which they allegedly appear, would be confused. Likelihood of confusion is inherently a contextual inquiry; the *Polaroid* factors that guide it require an evaluation not in the abstract, but in the particular circumstances in which a user might encounter it. *Id.* at 384. The problem with Plaintiffs' claim is that it arises in the relatively novel context of the output of an LLM-based tool, but Plaintiffs have included no allegations about how any real person (aside from a possible hypothetical prompter) ever has or ever would encounter or react to such output.

As a result, the Complaint makes no showing on key factors in the analysis, including the "overall impression created by the [marks] and the context in which they are found," *Star Industries*, 412 F.3d at 386; "whether the two products have an overlapping client base that creates a potential for confusion," *Brennan's Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 134 (2d Cir. 2004); and the "sophistication of … buyers," *Savin Corp.*, 391 F.3d at 456. Add to that list a complete failure to allege a single instance of "*actual* consumer confusion," *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir. 1998), a failing that has resulted in dismissal at the pleading stage, *OffWhite Productions*, 480 F. Supp. 3d at 566 (rejecting

22

conclusory allegation that "consumers making actual purchasing decisions are likely to confuse defendant's wide variety of goods with those of plaintiff"). And all of this is in a context where there is not even a hint that Cohere engaged in some bad faith scheme to "adopt[] [a] mark with the intention of capitalizing on plaintiff's reputation and goodwill." *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991) (citation omitted).

Because Plaintiffs' hypotheticals do not establish a real-life "probability of confusion … affecting numerous ordinary prudent purchasers," *Star Industries*, 412 F.3d at 383 (citation omitted), their trademark claims fail.

### C.    Any Use Of the Marks Was Nominative Fair Use.

Finally, Plaintiffs' claims fail because they are based on non-actionable nominative fair uses. "The doctrine of nominative fair use allows a defendant to use a plaintiff's trademark to identify the plaintiff's goods so long as there is no likelihood of confusion about the source of the defendant's product or the mark-holder's sponsorship or affiliation." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010) (cleaned up). The doctrine "is not an affirmative defense," but rather "shorthand for a particular way the use of one trademark might not be likely to cause consumer confusion." *Portkey Techs. Pte Ltd. v. Venkateswaran*, No. 23-CV-5074 (JPO), 2024 WL 3487735, at *7 (S.D.N.Y. July 19, 2024) (cleaned up). At bottom, nominative fair use supports the foundational principle that "a defendant may lawfully use a plaintiff's trademark where doing so is necessary to describe the plaintiff's product and does not imply a false affiliation or endorsement by the plaintiff of the defendant." *Tiffany*, 600 F.3d at 102-03.

Courts in the Second Circuit consider the following three nominative fair use factors "in addition to considering the *Polaroid* factors":

(1) whether the use of plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service, that is, whether the product or service is not readily identifiable without use of the mark; (2) whether

the defendant uses only so much of the plaintiff's mark as is necessary to identify the product or service; and (3) whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the plaintiff holder, that is, whether the defendant's conduct or language reflects the true or accurate relationship between plaintiff's and defendant's products or services.

*Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 168 (2d Cir. 2016). Each of these factors cuts decisively in Cohere's favor.

First, Cohere—or, really, Cohere's model—uses the third-party marks only as necessary to describe Plaintiffs' product when responding to Plaintiffs' own stylized queries—e.g., "the article from the Fort Worth Star-Telegram" or "the article you requested originally published in the LA Times." Compl. Ex. D, Example Nos. 1, 2. To elicit the complained-of output, per Plaintiffs' allegations, the user has to specifically request an article from an outlet. To be responsive to that request, the model intuits that it must confirm to the user that it is indeed providing a response based on content from the requested publication. Of course, Plaintiffs allege that the model is saying something incorrect. But that has no bearing on the *nature* of the use, which is simply to identify.

Second, in all of Plaintiffs' examples, the output uses only so much of Plaintiffs' mark as necessary to identify the publication. Indeed, the model simply reproduces the part of the mark that the user inputs. Plaintiffs do not allege that Cohere "stepped over the line into a likelihood of confusion by using [Plaintiffs'] mark[s] too prominently or too often, in terms of size, emphasis, or repetition." *International Information Systems*, 823 F.3d at 168 (cleaned up). Indeed, again, it is not *Cohere* making a conscious decision to use a particular mark at all—the display of marks is an incidental byproduct of the functioning of the model.

Third, aside from reproducing the mark to identify the content that a user requests, Cohere makes no other use of Plaintiffs' marks. Plaintiffs "offer[] no non-conclusory allegations to suggest that [Cohere] inaccurately depicts its relationship with [Plaintiffs] or [Plaintiffs']

products and services" in any other part of the output aside from use of the marks to identify Plaintiffs' product, *Chanel, Inc. v. RealReal, Inc.*, 449 F. Supp. 3d 422, 439 (S.D.N.Y. 2020) (dismissing claims for trademark infringement and false endorsement on nominative fair use grounds).

What Plaintiffs are complaining about is simply not a trademark claim. Whether emanating from a blogger's fingertips or from a large language model, an internet communication that simply responds to a request for factual information—even incorrectly—is no place for a body of law trained at commercial communications regarding the source of products or services. Recognizing a claim in this context would yield a perilous expansion of trademark law into the realm of speech, hindering the spread of knowledge, learning, and understanding. Because Plaintiffs have not plausibly alleged a cognizably trademark theory, this Court should dismiss the trademark claims.

## CONCLUSION

For the foregoing reasons, the court should dismiss Counts II, III, and IV, and dismiss Count I to the extent it is based on "substitutive summaries."

Dated: May 22, 2025                                       Respectfully Submitted,


                                                          /s/ R. David Hosp
Christopher J. Cariello                                    R. David Hosp
ORRICK, HERRINGTON & SUTCLIFFE LLP                        Mark S. Puzella (*pro hac vice*)
51 West 52nd Street                                       Sheryl Koval Garko (*pro hac vice*)
New York, NY 10019                                        Laura Najemy (*pro hac vice*)
(212) 506-5000                                            ORRICK, HERRINGTON & SUTCLIFFE LLP
ccariello@orrick.com                                      222 Berkeley Street, Suite 2000
                                                          Boston, MA 02116
                                                          (617) 880-1802
Annette L. Hurst (*pro hac vice*)                         dhosp@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP                        mpuzella@orrick.com
405 Howard Street                                         sgarko@orrick.com
San Francisco, CA 94105                                   lnajemy@orrick.com
(415) 773-5700
ahurst@orrick.com
                                                          Geoffrey Moss (*pro hac vice*)
                                                          Avery Cartwright (*pro hac vice*)
Amanda Lack (*pro hac vice*)                              ORRICK, HERRINGTON & SUTCLIFFE LLP
ORRICK, HERRINGTON & SUTCLIFFE LLP                        355 S. Grand Avenue, Suite 2700
353 N. Clark Street, Suite 3600                           Los Ángeles, CA 90071
Chicago, IL 60654                                         (213) 629-2020
(312) 924-9800                                            gmoss@orrick.com
alack@orrick.com                                          acartwright@orrick.com


*Counsel for Defendant Cohere Inc.*

## CERTIFICATE OF WORD COUNT COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), the foregoing is proportionally spaced and contains

7,882 words, according to the word processing program used to prepare it.


/s/ R. David Hosp
_____
R. David Hosp
*Counsel for Defendant Cohere Inc.*