**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

ADVANCE LOCAL MEDIA LLC; ADVANCE
MAGAZINE PUBLISHERS INC. D/B/A
CONDÉ NAST; THE ATLANTIC MONTHLY
GROUP LLC; FORBES MEDIA LLC;
GUARDIAN NEWS & MEDIA LIMITED;
INSIDER, INC.; LOS ANGELES TIMES
COMMUNICATIONS LLC; THE
MCCLATCHY COMPANY, LLC; NEWSDAY,
LLC; PLAIN DEALER PUBLISHING CO.;
POLITICO LLC; THE REPUBLICAN
COMPANY; TORONTO STAR NEWSPAPERS
LIMITED; and VOX MEDIA, LLC,

        Plaintiffs,

   v.

COHERE INC.,

        Defendant.

Civil Action No. 25-cv-1305-CM

**PUBLISHERS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD ......................................................................................................... 4

ARGUMENT ...................................................................................................................... 4

    I.    The Complaint states a claim for secondary copyright infringement (Count II) ............. 4

      A.   Publishers plausibly allege underlying direct infringement ........................................... 5

      B.   Cohere knows or has reason to know of direct infringement. ...................................... 8

      C.   Cohere affirmatively encourages infringement. ......................................................... 11

    II.   The Complaint states a claim for Cohere's direct infringement by providing "substitutive summaries" (Count I, in part) .................................................................. 12

    III.  The Complaint states plausible Lanham Act claims (Counts III and IV). ................... 16

      A.   Publishers allege that Cohere uses Publishers' trademarks in commerce. ................... 17

      B.   Cohere's passing off is not nominative fair use ........................................................... 22

      C.   Publishers allege that Cohere's use is likely to confuse consumers. ........................... 23

        1.   Cohere's use of Publishers' trademarks is likely to cause source confusion ............. 23

        2.   Cohere's use of Publishers' trademarks is likely to cause sponsorship confusion. ..... 25

CONCLUSION .................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*1-800-Contacts, Inc. v. WhenU.Com, Inc.*,
   414 F.3d 400 (2d Cir. 2005) ........................................................................... 20, 21

*Adecco USA, Inc. v. Staffworks, Inc.*,
   2021 WL 2593304 (N.D.N.Y. June 23, 2021) ...................................................... 20

*Am. Geophysical Union v. Texaco*,
   60 F.3d 913 (2d. Cir. 1994) ................................................................................... 7

*Andersen v. Stability AI Ltd.*,
   744 F.Supp.3d 956 (N.D. Cal. 2024) ............................................................... 6, 12

*Arista Recs. LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010) ................................................................................... 8

*Arista Recs. LLC v. Lime Grp. LLC*,
   2011 WL 1641978 (S.D.N.Y. Apr. 29, 2011) ........................................................ 6

*Arista Recs. LLC v. Lime Grp. LLC*,
   784 F.Supp.2d 398 (S.D.N.Y. 2011) ................................................................... 12

*Arista Recs. LLC v. Usenet.com, Inc.*,
   633 F.Supp.2d 124 (S.D.N.Y. 2009) ........................................................... 6, 9, 11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................................. 4

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
   931 F.Supp.2d 537 (S.D.N.Y. 2013) ............................................................... 7, 14

*Baiul v. NBCUniversal Media, LLC*,
   2014 WL 1651943 (S.D.N.Y. Apr. 24, 2014) ................................................. 21, 22

*Beastie Boys v. Monster Energy Co.*,
   66 F.Supp.3d 424 (S.D.N.Y. 2014) ..................................................................... 17

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (U.S. 2007) ...................................................................................... 4

*BMG Rts. Mgmt. (US) LLC v. Altice USA, Inc.*,
   2023 WL 3436089 (E.D. Tex. May 12, 2023) ....................................................... 7

*BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*,
   199 F.Supp.3d 958 (E.D. Va. 2016) ...................................................................... 6

*BMG Rts. Mgmt. (US) LLC. v. Cox Commc'ns, Inc.*,
   881 F.3d 293 (4th Cir. 2018) ................................................................................. 6

*C=Holdings B.V. v. Asiarim Corp.*,
   992 F.Supp.2d 223 (S.D.N.Y. 2013) ................................................................... 23

*Capitol Recs., LLC v. ReDigi Inc.*,
  934 F.Supp.2d 640 (S.D.N.Y. 2013) ................................................................ 9, 10

*Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*,
  150 F.3d 132 (2d Cir. 1998) ................................................................................ 16

*Champion v. Moda Operandi, Inc.*,
  561 F.Supp.3d 419 (S.D.N.Y. 2021) .................................................................... 23

*Chanel, Inc. v. RealReal, Inc.*,
  449 F.Supp.3d 422 (S.D.N.Y. 2020) .................................................................... 23

*Coach, Inc. v. Allen*,
  2012 WL 2952890 (S.D.N.Y. July 19, 2012) ........................................................ 23

*Craft v. Kobler*,
  667 F. Supp. 120 (S.D.N.Y.1987) ........................................................................ 14

*Dall. Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,
  604 F.2d 200 (2d Cir. 1979) ................................................................................ 25

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
  539 U.S. 23 (2003) .............................................................................................. 17

*DFO Glob. Performance Com. Ltd. (Nev.) v. Nirmel*,
  2021 WL 3475596 (S.D.N.Y. Aug. 6, 2021) ........................................................ 21

*Folsom v. Marsh*,
  9 F. Cas. 342 (C.C.D. Mass. 1841) ...................................................................... 13

*Franklin v. X Gear 101, LLC*,
  2018 WL 3528731 (S.D.N.Y. July 23, 2018) ........................................................ 21

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
  443 F.2d 1159 (2d Cir. 1971) ................................................................................ 9

*Gidatex, S.r.L. v. Campaniello Imps., Ltd.*,
  82 F.Supp.2d 119 (S.D.N.Y. 1999) ...................................................................... 19

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011) .............................................................................................. 9

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
  286 F.Supp.2d 284 (S.D.N.Y. 2003) .................................................................... 25

*Guthrie Healthcare Sys. v. ContextMedia, Inc.*,
  826 F.3d 27 (2d Cir. 2016) .................................................................................. 24

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985) ............................................................................................ 14

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009) .................................................................................. 5

*Int'l Code Council, Inc. v. UpCodes Inc.*,
  43 F.4th 46 (2d Cir. 2022) .................................................................................... 4

*Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*,
   823 F.3d 153 (2d Cir. 2016) ........................................................................ 22, 25

*Int'l News Serv. v. Associated Press*,
   248 U.S. 215 (1918) ................................................................................................ 13

*Jack Daniels Props., Inc. v. VIP Prods. LLC*,
   599 U.S. 140 (2023) .......................................................................................... 16, 17

*Kelly-Brown v. Winfrey*,
   717 F.3d 295 (2d Cir. 2013) ............................................................................ 18, 24

*Kominms v. Starbucks Corp.*,
   692 F.Supp.3d 236 (S.D.N.Y. 2023) ..................................................................... 5

*LoanStreet, Inc. v. Troia*,
   2022 WL 3544170 (S.D.N.Y. Aug. 17, 2022) .................................................. 17, 18

*Lopez v. Bonanza.com, Inc.*,
   2019 WL 5199431 (S.D.N.Y. Sept. 30, 2019) ...................................................... 21

*Luvdarts, LLC v. AT&T Mobility, LLC*,
   710 F.3d 1068 (9th Cir. 2013) ................................................................................. 9

*Lynch v. City of New York*,
   952 F.3d 67 (2d Cir. 2020) ....................................................................................... 4

*Matthew Bender & Co. v. West Publ'g Co.*,
   158 F.3d 693 (2d Cir. 1998) ..................................................................................... 8

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005) ................................................................................................ 11

*Michael Grecco Prods., Inc. v. Alamy, Inc.*,
   372 F.Supp.3d 131 (E.D.N.Y. 2019) ....................................................................... 5

*Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*,
   182 F.3d 133 (2d Cir. 1999) ................................................................................... 24

*New York Times Co. v. Microsoft Corp.*,
   2025 WL 1009179 (S.D.N.Y. Apr. 4, 2025) ...................................... 6, 8, 9, 10, 16

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
   166 F.3d 65 (2d Cir. 1999) ....................................................................... 12, 14, 15

*North Star IP Holdings, LLC v. Icon Trade Servs., LLC*,
   710 F.Supp.3d 183 (S.D.N.Y. 2024) ..................................................................... 18

*NYP Holdings v. New York Post Publ'g Inc.*,
   63 F.Supp.3d 328 (S.D.N.Y. 2014) ....................................................................... 24

*OBH, Inc. v. Spotlight Mag., Inc.*,
   86 F.Supp.2d 176 (W.D.N.Y. 2000) ...................................................................... 19

*OffWhite Prods., LLC v. Off-White LLC*,
   480 F.Supp.3d 558 (S.D.N.Y. 2020) ..................................................................... 19

*Pearson Educ., Inc. v. Labos*,
2019 WL 1949820 (S.D.N.Y. Apr. 23, 2019) ........................................................ 19

*Planned Parenthood Fed'n of Am., Inc. v. Bucci*,
1997 WL 133313 (S.D.N.Y. Mar. 24, 1997) ........................................................ 17

*Polaroid Corp. v. Polarad Elecs. Corp.*,
287 F.2d 492 (2d Cir. 1961) ................................................................................ 23

*Portkey Techs. Pte Ltd. v. Venkateswaran*,
2024 WL 3487735 (S.D.N.Y. July 19, 2024) ...................................................... 20

*Rams v. Def Jam Recordings, Inc.*,
202 F.Supp.3d 376 (S.D.N.Y. 2016) ...................................................................... 9

*Rescuecom Corp. v. Google Inc.*,
562 F.3d 123 (2d Cir. 2009) ................................................................................ 21

*Robinson v. Random House, Inc.*,
877 F. Supp. 830 (S.D.N.Y. 1995) ...................................................................... 14

*Rogers v. Grimaldi*,
875 F.2d 994 (2d Cir. 1989) ................................................................................ 16

*Salinger v. Random House, Inc.*,
811 F.2d 90 (2d Cir. 1987) ............................................................................ 14, 15

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) .............................................................................................. 8

*U.S. Naval Inst. v. Charter Commc'ns, Inc.*,
936 F.2d 692 (2d Cir. 1991) .................................................................................. 8

*UMG Recordings, Inc. v. RCN Telecom Servs., LLC*,
2020 WL 5204067 (D.N.J. Aug. 31, 2020) ............................................................ 6

*United We Stand Am., Inc. v. United We Stand, Am. N.Y.*,
128 F.3d 86 (2d Cir. 1997) ............................................................................ 18, 20

*Viacom Int'l, Inc. v. YouTube, Inc.*,
676 F.3d 19 (2d Cir. 2012) .................................................................................... 9

*Wainwright Sec., Inc. v. Wall St. Transcript Corp.*,
558 F.2d 91 (2d Cir. 1977) .................................................................................. 13

*Warner Bros. Ent. v. RDR Books*,
575 F.Supp.2d 513 (S.D.N.Y. 2008) .................................................................... 14

*Warner Bros. Recs., Inc. v. Payne*,
2006 WL 2844415 (W.D. Tex. July 17, 2006) ........................................................ 5

*Williams v. Citigroup Inc.*,
659 F.3d 208 (2d Cir. 2011) ................................................................................ 25

*World Wrestling Fed'n Ent., Inc. v. Bozell*,
142 F.Supp.2d 514 (S.D.N.Y. 2001) .................................................................... 18

*Yankee Publ'g Inc. v. News Am. Publ'g Inc.*,
    809 F.Supp. 267 (S.D.NY. 1992) ........................................................ 17

**STATUTES**

17 U.S.C. § 512(c) ................................................................................ 9

**OTHER AUTHORITIES**

First Am. Compl., *Center for Investigative Reporting, Inc. v. OpenAI, Inc.*,
    No. 24-cv-04872-SHS-OTW (S.D.N.Y. Sept. 24, 2024) ..................... 15

U.S. COPYRIGHT OFFICE, *Copyright and Artificial Intelligence*,
    *Part 3: Generative AI Training* (2025) ............................................ 14

**RULES**

Fed. R. Civ. P. 15(a)(2) ....................................................................... 25

**TREATISES**

3 McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:5 (5th ed. 2025) ..................... 16

## INTRODUCTION

Cohere describes itself as "a different kind of AI company" and its technology as "groundbreaking." Mot. 1, ECF No. 50. But there is nothing remarkable about copying articles off the internet, republishing copies of those articles, or distributing subpar products under another company's good name. That is old-fashioned infringement. The promise of AI should not be confused with systematic copyright and trademark infringement, which threatens the economic viability of journalism—a cornerstone of our democracy.

Cohere claims that no customer "ever has" or "even *would*" use its models to obtain news or magazine articles. *Id.* But that assertion flies in the face of how Cohere built, operates, and markets its service. Cohere bills its product as a "knowledge assistant" that will "access the latest news," including real-time content, through a process called retrieval augmented generation ("RAG"). Compl. ¶¶ 4, 66–67. Publishers' well-pled allegations detail how Cohere's models work, how Cohere encourages them to be used, and how they are used. The Complaint depicts those models in action, reflecting plausible consumer use, and it is more than enough to state the claims alleged. A further record, including evidence that is not public, will be developed in discovery.

Cohere stresses its focus on "enterprise" customers as opposed to individual consumers—an irrelevant distinction. While Cohere's clients may be businesses, their users are individuals. Cohere would have the Court believe that enterprise users would not review a *Business Insider* article on China's economy or a *Los Angeles Times* piece on the California labor market. *E.g.*, Compl., Ex. A, at 30, 72. Cohere's argument defies common sense and conflicts with its own marketing materials, which expressly encourage customers to use its models "to access the latest news." *Id.* ¶ 67. Publishers' numerous licensing deals with corporate customers, *see id.* ¶¶ 67, 34–35, underscore enterprise licensees' demand for news content.

For the reasons set forth herein, Cohere's motion should be denied in full.

## BACKGROUND

Plaintiffs[1] (collectively, "Publishers") are among "the largest, most enduring, and most important news, magazine, and digital publishers in the United States and around the world." Compl. ¶ 1. Publishers' well-written, fact-checked articles offer "information, analysis, and commentary" on a wide range of topics, including "science, health, business, economics, sports, technology, and culture." *Id.* ¶ 33. Publishers are recognized for their quality reporting, *see id.* ¶¶ 42–57, and have earned journalism's highest honors, including several Pulitzer Prizes, *see id.* ¶¶ 11–13, 18, 22–27, 73. As a result, their "brands are known to the public as high-quality sources of reliable and informative content." *Id.* ¶ 59. Publishers distribute their articles directly through their websites, *id.* ¶¶ 11–12, 17–26, 53, 56; *id.*, Ex. A, at 1–10, 46–63, and license articles to online platforms, clippings and media monitoring services, research outlets and intelligence platforms, and for corporate-oriented uses, *id.* ¶ 35. Publishers have also already begun to license articles for use in training datasets for large language models ("LLMs") and in RAG outputs, *id.* ¶ 37, and to enter partnerships to deliver branded news content through AI chatbots. *Id.* ¶¶ 37–39.

Cohere is a multibillion-dollar company that sells a suite of LLM systems called the "Command Family." *Id.* ¶¶ 3–4. Cohere highlights RAG, a term coined by a Cohere researcher, as a core feature of its models. *Id.* ¶ 4. RAG allows Command models to draw on sources beyond their training data, like websites, to generate responses. *Id.* Training data quickly grows stale, and RAG enables models to stay current. *Id.* ¶ 73. In July 2023, Cohere made its Chat product available

---

[1] Plaintiffs are Advance Local Media LLC ("Advance Local Media"), Advance Magazine Publishers Inc. ("Condé Nast"), The Atlantic Monthly Group ("The Atlantic"), Forbes Media LLC ("Forbes"), Guardian News & Media Limited ("The Guardian"), Insider, Inc. ("Business Insider"), Los Angeles Times Communications LLC ("LA Times"), The McClatchy Company, LLC ("McClatchy"), Newsday, LLC ("Newsday"), Plain Dealer Publishing Co. ("The Plain Dealer"), Politico LLC ("Politico"), The Republican Company ("The Republican"), Toronto Star Newspapers Limited ("Torstar"), and Vox Media, LLC ("Vox Media").

on its website as a "free trial . . . to serve its goal of capturing more paying customers." *Id.* ¶ 63.

News delivery is a key selling point for Cohere. In July 2023, Cohere's first post announcing Chat showed the model retrieving an article from *Wired*, a Condé Nast publication. *Id.* ¶ 66. That September, Cohere again prodded users to access news articles through its models, suggesting that developers can use Command "to access the latest news about trends and competitors in their space." *Id.* ¶ 67. Cohere even "prepopulates the [Chat] interface with a request to summarize recent technology news, inviting prospective customers to use the models to access news stories." *Id.* ¶ 69. Indeed, real-time access to Publishers' works is essential for Cohere to operate Command as a "knowledge assistant," and the Complaint shows examples of Command delivering copies of articles hours after publication. *Id.* ¶ 99. Cohere is capable of adopting guardrails to prevent Command from outputting copyrighted material but has chosen not to develop or implement them. *Id.* ¶¶ 98, 113.

Rather than obtain licenses from Publishers, Cohere copies and downloads Publishers' articles from Publishers' websites and from an unlicensed compilation of web text in which "Publishers' works are among the most highly represented sources." *Id.* ¶¶ 71, 82, 83, 85–86. Cohere uses those unauthorized copies to train its Command models and makes multiple additional copies of the works in the process. *Id.* ¶¶ 1, 3–4, 7, 71–72, 97. Cohere's AI models, which are accessible through its Chat interface or through an API, deliver outputs that include full verbatim copies, substantial excerpts, and substitutive summaries of Publishers' works—even breaking news pieces and paywalled articles. *Id.* ¶¶ 4, 76. Cohere also generates its own articles but, using Publisher's trademarks, attributes those hallucinated articles to Publishers. *Id.* ¶¶ 70, 118–21.

The Complaint shows Cohere's AI model responding to queries from Publishers' investigators, *see id.* ¶¶ 82, 134, Exs. B, D. Some are general prompts, such as "Tell me about the

budget strains on future transit funding in Miami-Dade county." *Id.* ¶¶ 91, 95. Other queries requested specific articles or coverage. *E.g.*, *id.* ¶¶ 94, 99. Cohere responded with full copies of Publishers' articles, visible both "under the hood" and in verbatim or near-verbatim responses in the Chat interface. *Id.* ¶¶ 76, 80; *id.*, Ex. B. In other instances, Cohere created a full-text copy "under the hood" and generated a summary that closely paraphrased the Publisher's article. *Id.* ¶¶ 105–09. Altogether, Exhibit A to the Complaint has a non-exhaustive list of over 4,000 of Publishers' works that Cohere infringed, *see id.* ¶¶ 9, 82, Ex. A. Finally, when RAG is not turned on, Cohere provides fake articles branded with Publishers' trademarks. *See id.* ¶ 118, Ex. D.

## LEGAL STANDARD

Publishers need only allege "enough facts to state a claim to relief that is plausible on its face" to defeat a Rule 12(b)(6) motion to dismiss. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (U.S. 2007). When evaluating the Complaint's sufficiency, the Court must accept the facts alleged as true, "draw all reasonable factual inferences in favor of the plaintiff," *Lynch v. City of New York*, 952 F.3d 67, 76 (2d Cir. 2020), and "draw on its judicial experience and common sense," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). As described below, Cohere's attacks fail as a matter of law or, at a minimum, raise factual disputes that cannot be resolved on a motion to dismiss.

## ARGUMENT

**I.    The Complaint states a claim for secondary copyright infringement (Count II).**

Cohere's argument that the Complaint lacks allegations of direct infringement to support a secondary infringement claim is meritless. Cohere disagrees with Publishers' factual allegations concerning Cohere's knowledge and intent, how its customers respond to its Terms of Service, how consumers behave, and more. But those disputes are inappropriate to resolve on a motion to dismiss. *See Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 62–63 (2d Cir. 2022) (effect of website disclaimers); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir.

2009) (defendant's intent); *Kominms v. Starbucks Corp.*, 692 F.Supp.3d 236, 245 (S.D.N.Y. 2023) (consumer behavior); *Michael Grecco Prods., Inc. v. Alamy, Inc*., 372 F.Supp.3d 131, 139 (E.D.N.Y. 2019) (knowledge and intent in copyright infringement). Beyond its factual disputes, Cohere attacks Count II in three ways. All fail.

### A. Publishers plausibly allege underlying direct infringement.

The Complaint and its exhibits contain extensive and detailed factual allegations regarding direct infringement. Rather than conduct its own journalism, Cohere supplies users with articles taken without consent from, or compensation to, the creators of the content. Compl. ¶¶ 70, 82, 94. Cohere essentially acts as an unlicensed news syndicator. When asked for a Publisher's article by name, Cohere provides a verbatim copy. *See*, *e.g.*, *id*. ¶ 94 ("Give me the full unaltered article L.A. fashion brand and celeb favorite L'Agence is in major growth mode published by The LA Times."). When asked what one of the Publishers says about a topic, Cohere provides a verbatim copy. *See*, *e.g.*, *id.*, Ex. B, at 34 ("Tell me what Forbes said about the 9 Ukrainian drone operators that were murdered by Russians."). Even when asked generally about a topic, Cohere provides Publishers' articles. For example, when asked about financial strains on the public transit system in Miami-Dade County, Cohere delivered a full article from the *Miami Herald. Id*. ¶ 95. Cohere even delivers full articles for breaking news and hot "scoops," such as *Business Insider*'s reporting on Disney's CEO succession provided exclusively to its subscribers. *Id*. ¶¶ 99–100. Exhibit B to the Complaint contains additional illustrative examples, depicting both verbatim and non-verbatim copying.

By taking issue with the source of Publishers' many examples of infringement, Cohere ignores both the practical reality of evidence collection and relevant precedent. As with many online services, the record of infringement using Command is not visible to third parties. Infringement "typically takes place behind closed doors." *Warner Bros. Recs., Inc. v. Payne*, 2006 WL 2844415, at *3 (W.D. Tex. July 17, 2006). To protect their rights and gather evidence of

infringement, copyright owners or their agents often must interact directly with the infringer. Accordingly, "[c]ourts routinely base findings of infringement on the actions of plaintiffs' investigators." *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F.Supp.2d 124, 150 n.16 (S.D.N.Y. 2009); *accord UMG Recordings, Inc. v. RCN Telecom Servs., LLC*, 2020 WL 5204067, at *6 (D.N.J. Aug. 31, 2020); *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F.Supp.3d 958, 972 (E.D. Va. 2016), *aff'd in part, rev'd in part on other grounds*, 881 F.3d 293 (4th Cir. 2018). And numerous courts have rejected the argument Cohere now makes, *see* Mot. 10, that distributions or displays to an investigator are "authorized" and thus non-infringing. *Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL 1641978, at *8 (S.D.N.Y. Apr. 29, 2011) (collecting cases).

Cohere concedes that the Complaint has many examples of infringing outputs and asserts those "might suffice if the way [Publishers] used Cohere's tools reflect the way real users might[.]" Mot. 10. But Cohere fails to explain, and cannot explain, why the examples in the Complaint are insufficient. Publishers' examples depict Cohere's service in action, with natural language prompts under the very "use case" that Cohere repeatedly encourages and expects. Courts, including in this district, routinely allow similar secondary infringement claims to proceed. *New York Times Co. v. Microsoft Corp.* (*New York Times*), 2025 WL 1009179, at *1–2 (S.D.N.Y. Apr. 4, 2025); *Andersen v. Stability AI Ltd.*, 744 F.Supp.3d 956, 968–69 (N.D. Cal. 2024); *see also supra* at 5–6.

Cohere argues that *New York Times* is distinguishable because the court noted the "widely publicized instances of copyright infringement" after defendants launched their LLM. Mot. 11 (citing *New York Times*, 2025 WL 1009179, at *9–10). Cohere makes too much of the court's observation, which did not drive its decision. Instead, the decision relied primarily on "more than 100 pages of examples" of infringement in the *New York Times* complaint and "dozens of examples" in the *Daily News* complaint. *Id*. at *10. The examples in this case are no less powerful

than those in *New York Times*, where ChatGPT was prompted with an article excerpt and asked to supply the remainder. *See id.* at \*22. Indeed, Publishers' examples—short, simple queries on a given topic, source, or article of general interest—are more reflective of plausible user queries.

Cohere's users can be expected to use Command to obtain news and magazine articles, as Cohere specifically marketed that as a relevant use case. *See* Compl. ¶¶ 66–68. In addition, infringement of news reporting in the business context is unfortunately common. *See, e.g.*, *Am. Geophysical Union v. Texaco*, 60 F.3d 913, 915 (2d. Cir. 1994) (explaining that corporate defendant copied plaintiffs' scientific publications widely for use by its researchers); *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F.Supp.2d 537, 541, 546 (S.D.N.Y. 2013) (explaining that corporate defendant scraped plaintiff's news articles to provide excerpts to subscribers). Publishers are actively engaged in licensing their works to the many businesses that have an interest in news and magazine content and wish to respect copyright. *See id*. ¶¶ 35–38. Cohere's insistence that its customers would not use Command to obtain such content belies Cohere's marketing, how Cohere's service functions, and common sense.

Cohere's discussion of its Terms of Service is unavailing. For underlying direct infringement to support secondary infringement, what matters is how consumers use the models, not whether Cohere's Terms of Service forbid infringement. Users routinely infringe online, regardless of the fine print in user agreements. *See, e.g.*, *BMG Rts. Mgmt. (US) LLC v. Altice USA, Inc.*, 2023 WL 3436089, at \*8 (E.D. Tex. May 12, 2023) (finding users engaged in significant online infringement despite service's stated terms). Moreover, Cohere's written policy does not prohibit using the models to retrieve news, a use Cohere specifically encourages. That is what the examples in the Complaint reflect, not hacking of Cohere's system or evasion of its guardrails.

Cohere's reliance on *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693 (2d Cir.

1998), is misplaced. *Matthew Bender* concerned West Publishing's copyrighted arrangement of judicial opinions in printed case reporters. *Id.* at 695. The defendant sold copies of judicial opinions on CD-ROMs. *Id*. These discs arranged the cases differently from the official West reporter but contained West's "star pagination," theoretically allowing a user to print each case, replicating the page breaks as they appeared in West's books. *Id.* at 697. At summary judgment, the court rejected a contributory infringement claim, holding that the CD-ROM was a "staple article of commerce" capable of substantial non-infringing uses. *Id.* at 707 (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)). The court merely observed that the only user undertaking the "thankless toil" of recreating a West reporter page by page was West's counsel—and West offered no evidence or argument that these actions reflected general usage. *Id*. at 706. But that was not the basis of its holding. In any event, that is not this case. Obtaining a copyrighted news or magazine article for free from Cohere with a few keystrokes—as Cohere encourages—is readily distinguishable by its obvious real-world appeal. Recognizing this, in *New York Times*, the court distinguished *Matthew Bender* along these lines and found plaintiffs' hundreds of pages of infringing examples to be adequate. 2025 WL 1009179, at *9–10.

Cohere's citation to *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692 (2d Cir. 1991), is equally fruitless. That a copyright holder's claim against its licensee was found to lie in contract, not infringement, *id.* at 695–96, does not diminish the use of evidence from investigators.

### B. Cohere knows or has reason to know of direct infringement.

The Complaint plausibly alleges that Cohere had the knowledge required for contributory copyright infringement. The Second Circuit has made clear that "contributory infringement liability is imposed on persons who 'know *or have reason to know*' of the direct infringement." *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010). "[K]nowledge of specific infringements is not required to support a finding of contributory infringement." *Usenet.com, Inc.*,

633 F.Supp.2d at 154. Moreover, willful blindness is tantamount to actual knowledge. *See, e.g.*, *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011).

Cohere cites out-of-circuit cases and irrelevant statutory subsections to obfuscate binding law. Ignoring the Second Circuit's test in favor of the Ninth's, Cohere argues that Publishers must show "actual knowledge" or willfulness blindness to "specific acts of infringement." Mot. 12 (quoting *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072–73 (9th Cir. 2013)). Cohere also includes a tangential discussion of scienter under the DMCA's safe harbor provision. Mot. 12 (citing *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) and 17 U.S.C. § 512(c)).

Cohere distorts Second Circuit precedent by citing a non-controlling Fourth Circuit discussion in *BMG Rights Management (US) LLC v. Cox Communications, Inc.*, 881 F.3d 293 (4th Cir. 2018). Mot. 12. In *BMG*, the court rejected a negligence ("should have known") standard for contributory liability, citing among other support the Second Circuit's statement in *Gershwin Publishing Corp. v. Columbia Artists Management, Inc*., 443 F.2d 1159 (2d Cir. 1971), that "one who knowingly participates or furthers a tortious act is jointly and severally liable with the prime tortfeasor." *BMG*, 881 F.3d at 309–10 (quoting *id.* at 1162). But the Second Circuit in *Gershwin* made clear that actual knowledge was only one way the knowledge prong might be satisfied. The court explained that a defendant can "be held liable as a 'contributory' infringer if it were shown to have had knowledge, *or reason to know*, of the infringing nature of the [third-party behavior]." *Id.* (emphasis added). And in the forty years since, courts in the Second Circuit have been clear that "know or should have known" is the standard. *See, e.g., Capitol Recs., LLC v. ReDigi Inc.*, 934 F.Supp.2d 640, 658 (S.D.N.Y. 2013); *Rams v. Def Jam Recordings, Inc.*, 202 F.Supp.3d 376, 383 (S.D.N.Y. 2016); *see also New York Times*, 2025 WL 1009179, at *8 (discussing circuit split).

Publishers' allegations give rise to the plausible inference that Cohere had sufficient

knowledge to support contributory liability. When assessing knowledge, "courts consider evidence of actual and constructive knowledge, including cease-and-desist letters, officer and employee statements, promotional materials, and industry experience." *ReDigi*, 934 F.Supp.2d at 658.

In this regard, Publishers allege that they "put Cohere on notice that it was not authorized to use their works by including copyright notices with their works and terms of service on their websites." Compl. ¶ 90. Cohere was also alerted by a cease-and-desist letter that its activities infringed, yet the copying continued. *Id.* Despite warnings, Cohere crawled Publishers' websites and other sources containing their articles, *id*. ¶¶ 71, 83, 86; copied Publisher's articles to train its AI models, *id*. ¶¶ 3–4, 71, 82–83; and disseminated copies of Publishers' articles, or portions thereof containing Publishers' creative expression, to users, *id*. ¶¶ 4, 7, 83–86. Cohere designed its models so that they provide Publishers' articles on demand, without permission from or compensation to Publishers. *Id*. ¶¶ 1, 3, 88, 90. Cohere knew that LLMs, like its Command series of models, are widely used to elicit copyrighted materials—not least of all, because Cohere took out an ad in the *Wall Street Journal* stating: "Ordinary AI is good for cocktail recipes. And stealing intellectual property." *Id*. ¶ 3. But Cohere chose not to limit infringement via its AI models. *See id*. ¶ 113. Instead, Cohere actively marketed Command as a tool to access news. *Id*. ¶¶ 65–69.

These facts show that retrieval and redistribution of copyrighted news articles is "central to [Cohere's] business model." *See New York Times*, 2025 WL 1009179, at *10 (quoting *ReDigi*, 934 F.Supp.2d at 659). These facts more than adequately plead that Cohere knew or should have known that its users infringe Publishers' copyrights. *See id.* (finding plausible knowledge of third-party infringement when plaintiff alleged "that defendants knew they were using copyrighted works to train their models and were fully aware of plaintiffs' protected interests" and that plaintiffs "even informed defendants 'that their tools infringed its copyrighted works,' supporting the

inference that defendants possessed actual knowledge of infringement by end users").

Cohere builds a strawman by incorrectly claiming that Publishers pled only "the mere suggestion of what an LLM is *capable* of doing," Mot. 13, and citing *Sony*, 464 U.S. at 456, as a basis for rejecting such a claim. Publishers' theory is not that Cohere is "liable simply for knowing that [its] product *could be used*" to infringe. Mot. 13. Instead, Publishers allege that Cohere "programmed its system" to retrieve and deliver copies of Publishers' works to end users. Compl. ¶ 93. Moreover, *Sony*'s holding is not as sweeping as Cohere suggests. The Court in *Sony* analyzed whether contributory infringement can be predicated entirely on the sale of a "staple article of commerce," like a VCR. Cohere's AI models, which are intangible computer services created in part by "training" on copyrighted material, are wholly distinct in function from content-agnostic videotape recorders. *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 935 (2005) ("[W]here evidence goes beyond a product's characteristics, or [a defendant's] knowledge that it may be put to infringing uses, . . . *Sony*'s staple-article rule will not preclude liability.").

Cohere argues, without elaboration or support, that dismissal is warranted because "what the model is capable of doing is bounded by its private, business deployments." Mot. 14. Cohere ignores that these "private deployments" are negotiated with, implemented, and serviced by Cohere. Cohere maintains an ongoing relationship with its users through the Command models, regardless of any customization. The continuous, post-sale relationships between Cohere and its customers render *Sony* inapplicable. *See Arista Recs.*, 633 F.Supp.2d at 156, 158 (holding *Sony*'s doctrine does not apply where defendants maintain ongoing relationship with users).

### C. Cohere affirmatively encourages infringement.

A defendant who takes active steps to encourage direct infringement, "such as advertising an infringing use," contributorily infringes by inducement. *Grokster*, 545 U.S. at 936. The Complaint alleges Cohere's active steps to encourage infringement. Cohere built and operates AI

models that retrieve, copy, and deliver Publishers' articles to users, without visiting lawful sources. *See* Compl. ¶¶ 3–4, 65–69, 76–77, 91, 93. It delivers articles on request and in response to even general questions about a topic. *Id.* ¶¶ 91, 93–96. Cohere unambiguously markets its models as a tool to access news, even demonstrating the model retrieving one of Publishers' copyrighted articles and prepopulating the Chat interface with a prompt to summarize news. *Id.* ¶¶ 65–69.

Courts have found inducement claims sufficiently pled based on similar allegations. *E.g.*, *Andersen*, 744 F.Supp.3d at 969 (finding pleadings sufficient "where plaintiffs allege that [defendant's AI model] is built . . . on copyrighted works," "that the way the product operates necessarily invokes copies or protected elements of those works," and that plaintiffs' works "can sometimes be reproduced as outputs from the AI products"); *see also Arista Recs. LLC v. Lime Grp. LLC*, 784 F.Supp.2d 398, 428–30 (S.D.N.Y. 2011) (finding inducement when "search functions [on defendant's platform] are designed to facilitate searches for copyrighted digital recordings" and defendant's "selective filtering" showed "knowledge of infringement-mitigating technologies and . . . intentional decision not to employ any such technologies in a way that meaningfully deters [its] users' infringing activities").

Cohere argues that its marketing is not inducement, because 'companies like Cohere have every right to republish the facts contained in [plaintiffs'] articles,' and users have every right to discover that news." Mot. 15 (quoting *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 70 (2d Cir. 1999)). But that is a non sequitur. Cohere does not limit Command's output to the raw facts reported in the underlying articles. *See, e.g.*, Compl. ¶¶ 91–92. Nor does Cohere's inapt comparison to search engines, *see* Mot. 15, excuse the inducement described above.

## II.    The Complaint states a claim for Cohere's direct infringement by providing "substitutive summaries" (Count I, in part).

Without contesting allegations that Cohere systematically copied Publishers' works,

including for RAG generation of competitive outputs, Cohere asks the Court to disregard copious examples of what the Complaint refers to as "substitutive summaries." Cohere is wrong.

For all 75 examples in Exhibit B to the Complaint, and indeed the 4,100+ articles listed in Exhibit A to the Complaint, Cohere's copying of those works in outputs is multifaceted. Cohere first copied the respective Publisher's original work in full, then displayed a full-text version of the original work "Under the Hood." Compl. ¶ 102. In addition, Cohere provided an output that is substantially similar to the original: 50 examples in Exhibit B are verbatim copies of the original (shown in blue font); and 25 examples in Exhibit B are a mix of verbatim copying (blue font) and close paraphrasing (green font), which function as substitutive summaries. *See id.*, Ex. B.

Cohere misunderstands the relevance of these summaries to evaluating Cohere's repeated infringements and misrepresents well-settled case law on when summaries infringe. While Cohere is perfectly free to investigate and report the "facts," just as Publishers do when covering the news, Cohere enriching itself by copying journalistic expression is infringement. It is "axiomatic that news events may not be copyrighted." *Wainwright Sec., Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 95 (2d Cir. 1977). But it is also settled that nonfictional abridgements infringe when they comprise "the facile use of the scissors; or extracts of the essential parts, constituting the chief value of the original work." *Folsom v. Marsh*, 9 F. Cas. 342, 345 (C.C.D. Mass. 1841) (No. 4,901). While all can report on a news event, copyright protects "the particular form or collocation of words in which the writer has communicated it." *Wainwright*, 558 F.2d at 95 (quoting *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 234 (1918)); *accord Meltwater*, 931 F.Supp.2d at 549 (explaining that fact compilations are entitled to protection and descriptions of facts even more). Even a copy that reproduces only general "similarities in structure and sequence" ("comprehensive nonliteral similarity") or a portion of the original text ("localized similarity in language") can

infringe. *Warner Bros. Ent. v. RDR Books*, 575 F.Supp.2d 513, 537 (S.D.N.Y. 2008); *accord Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987) (holding copy "paraphrased so closely as to diminish interest in purchasing the originals"); U.S. COPYRIGHT OFFICE, *Copyright and Artificial Intelligence*, *Part 3: Generative AI Training*, at 63–64 (2025) (finding RAG outputs likely to include abridgments that "contain protectable expression").

Cohere asks the Court to dismiss the *Toronto Star* example, Compl. ¶¶ 107–09, as copying and paraphrasing only 19.9% of the original. *See* Mot. 17. But the test for substantial similarity requires courts to examine what was copied, not what wasn't—and courts explicitly reject rigid formulas for how much copying will be deemed infringing. *See Craft v. Kobler*, 667 F. Supp. 120, 129 (S.D.N.Y.1987) (copying 3% infringed); *Robinson v. Random House, Inc.*, 877 F. Supp. 830, 842 (S.D.N.Y. 1995) (noting "no case" was cited in which 25% or more was deemed fair use and citing three cases where 3–13% infringed); *Meltwater*, 931 F.Supp.2d at 558 (holding so-called "search engine" infringed by sharing news summaries containing between 4.5% and 61% of underlying news articles); *Nihon*, 166 F.3d at 71 (holding impossible to decide infringement through simple word count).[2] Moreover, Cohere cannot generate an output copied from a Publisher's work and find refuge in the fact that, because the original was longer, its theft was merely a small portion of the copyrighted work. *See Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 564–65 (1985) (that substantial portion of the *infringing* work was copied shows the value of copied material); *Meltwater*, 931 F.Supp.2d at 551 (noting that to decide infringement, courts may consider what percentage of the copy is comprised of the original).

---

[2] Cohere wrongly claims that its outputs are invariably much shorter than or comprise a tiny portion of the originals. Mot. 17. For instance, Example 38 shows a 201-word output, of which 140 words are verbatim text and paraphrases from the original. *See* Compl., Ex. B, at 64. That output is nearly half of the original 307-word article and tells the heart of the story using the same structure.

Cohere argues that its summary of *The Oregonian* article covering rules on political expression in Portland schools, *see* Compl. ¶¶ 102–06, did not reproduce the copyrighted elements in the original. This is incorrect. The Command output tracks the article's organization, starting with a recitation of the new rule, then explaining its genesis, then describing the teachers' union reaction and grievance action. *Id.* ¶ 105. This structure is not chronological or obvious. The Command output also uses identical or synonymous language to *The Oregonian*'s investigative story, including phrases like "walls in the classroom" and "approved curriculum." *Id.* Similarly, the original describes the Portland Association of Teachers (PAT) publishing a "controversial guide to teaching and organizing in support of Palestinian statehood" which "is drawing pushback," after a "districtwide upheaval." *Id.* The Cohere copy describes this event as the PAT publishing "a controversial guide in support of Palestine" that "has faced backlash" after a "dust-up in the district." *Id.* In the Second Circuit, plagiarized abstracts of news articles infringe when they use "the same structure and organization, follow[] the same chronological and substantive grouping of facts, and result[] in the same conclusions or resolutions, and . . . employ[ ] identical phraseology and word choice." *Nihon*, 166 F.3d at 70–71. Even works containing "ordinary phrases" are protected when combined with similar sequences of short quotes or close paraphrasing. *See Salinger*, 811 F.2d at 97–99.

Cohere's citation to *New York Times* is inapplicable. *See* Mot. 15. The abridgement claim there was based on a very different factual record. The Center for Investigative Reporting (CIR), whose complaint against OpenAI was consolidated with that of the New York Times, alleged three examples of abridgement of articles published in *Mother Jones*.[3] On request, OpenAI generated

---

[3] *See* First Am. Compl. ¶ 121 & Ex. 11, ECF Nos. 88, 88-14, *Center for Investigative Reporting, Inc. v. OpenAI, Inc.*, No. 24-cv-04872-SHS-OTW (S.D.N.Y. Sept. 24, 2024).

summaries in the form of numbered lists of key points. CIR's complaint did not show verbatim copying or close paraphrasing or describe other ways that the output copied the original's protected expression, and the court found that those abridgments reflected only the facts within CIR's articles. *New York Times*, 2025 WL 1009179, at *28. Publishers' Complaint details extensive overlap between the copyrighted works and the infringing substitutive summaries in organization, factual selection, emphasis, language, writing style, and overall feel. *See Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 140 (2d Cir. 1998) (finding substantial similarity even though "the direct quotations or close paraphrases . . . are few and almost irrelevant").

This highly fact-bound claim should be decided on a full record. That includes expert or lay testimony on the similarity of the 25 substitutive summaries in Exhibit B to the originals.

### III.    The Complaint states plausible Lanham Act claims (Counts III and IV).

Publishers' businesses and hard-won reputations hinge on decades of trustworthy journalism. Their trademarks signal readers to expect first-rate articles from a reliable source. Publishers allege that Cohere puts those marks on Cohere's own articles. Cohere may see that as "nothing more than an error" and Publishers' claim as "novel," Mot. 17–18, but it is "the classic form of trademark infringement." 3 McCarthy on Trademarks and Unfair Competition § 25:5 (5th ed. 2025). It does not matter that Cohere infringes articles, an expressive product, rather than sneakers. "The purchaser of a book, like the purchaser of a can of peas, has a right not to be misled as to the source of the product." *Rogers v. Grimaldi*, 875 F.2d 994, 997 (2d Cir. 1989).

As the Supreme Court recently explained, "[t]he cardinal sin" under the Lanham Act is to "confuse consumers about source—to make (some of) them think that one producer's products are another's." *Jack Daniels Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 157 (2023). Cohere portrays its AI outputs as "pure communicative response[s]" and gestures at First Amendment concerns. Mot. 18, 25. But when a defendant "convey[s] information (or misinformation) about who is

responsible for a product," the ordinary trademark analysis applies. *Jack Daniels*, 599 U.S. at 157. "Nor does that result change because the use of a mark has other expressive content—*i.e.*, because it conveys some message on top of source." *Id.* Trademark law applies equally to written products—and "'generally prevails over the First Amendment' when 'another's trademark (or a confusingly similar mark) is used without permission' as a means of 'source identification.'" *Id.* at 159 (quoting *Yankee Publ'g Inc. v. News Am. Publ'g Inc.*, 809 F.Supp. 267, 276 (S.D.N.Y. 1992)).

Cohere's assertion, *see* Mot. 18, that *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), somehow limits Publishers' trademark claim is wrong. *Dastar* involved a reverse passing off claim based on the defendant's distribution of the plaintiff's work without attribution. *Dastar*, 539 U.S. at 34–35. Publishers' claim presents the opposite scenario: Cohere distributes its own fake pieces under Publishers' brand names. That is classic passing off, a claim squarely within existing trademark law. *See*, *e.g.*, *Beastie Boys v. Monster Energy Co.*, 66 F.Supp.3d 424, 454 n.18 (S.D.N.Y. 2014) (explaining that *Dastar* does not preclude passing off claims); *Russell v. Walmart Inc.*, 2023 WL 2628699, at *16–17 (C.D. Cal. Jan. 12, 2023) (same and collecting cases).

Each of Cohere's attacks on Counts III and IV fail.

### A. Publishers allege that Cohere uses Publishers' trademarks in commerce.

Cohere distributes fake articles bearing Publishers' marks to third parties as part of its commercial services. That activity easily satisfies the use-in-commerce requirement. The term "use in commerce" is "broad and has a sweeping reach." *LoanStreet, Inc. v. Troia*, 2022 WL 3544170, at *10 (S.D.N.Y. Aug. 17, 2022) (quoting *Planned Parenthood Fed'n of Am., Inc. v. Bucci*, 1997 WL 133313, at *3 (S.D.N.Y. Mar. 24, 1997)). It "denotes Congress's authority under the Commerce Clause rather than an intent to limit the [Lanham] Act's application to profitmaking activity." *United We Stand Am., Inc. v. United We Stand, Am. N.Y.*, 128 F.3d 86, 92–93 (2d Cir.

1997). Publishers are "not required to demonstrate that [Cohere] made use of the mark in any particular way to satisfy the 'use in commerce' requirement." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 305 (2d Cir. 2013). Instead, courts recognize several avenues to meeting this flexible standard. A defendant who displays a trademark online uses that mark in commerce. *LoanStreet, Inc.*, 2022 WL 3544170, at *10. So too does a defendant who uses a trademark in advertising. *North Star IP Holdings, LLC v. Icon Trade Servs., LLC*, 710 F.Supp.3d 183, 207 (S.D.N.Y. 2024). More broadly, when a defendant's "conduct affects the [plaintiffs'] ability to attract and retain consumers, sponsors, and advertisers of its products," the requirement is met. *World Wrestling Fed'n Ent., Inc. v. Bozell*, 142 F.Supp.2d 514, 529 (S.D.N.Y. 2001). Here, it is satisfied in several ways.

*First*, Publishers plead that Cohere uses Publishers' trademarks online. The Complaint alleges that Cohere displays Publishers' marks on its website and that Cohere's models, whether accessed through its website or API, generate and distribute outputs containing Publishers' marks to end users. Compl. ¶¶ 30, 63, 118, 121, 132, Ex. D. This alone is enough.

*Second*, Publishers allege that Cohere uses Publishers' trademarks when advertising Cohere's products and services. The Chat interface on Cohere's website is a "free trial" of Cohere's models, "available to serve [Cohere's] goal of capturing more paying customers." *Id.* ¶ 63. That Chat interface serves to bolster perceptions of the models' usefulness and reliability and thereby convert trial users into subscribers or nudge subscribers into more pay-as-you-go usage. *Id.* ¶¶ 63, 123; *see also id.* ¶ 4 n. 3 (citing Cohere statement that "verifiable answers" are one of the "key differentiators for our models that matter for enterprises").

*Third*, Publishers allege that Cohere's display of their trademarks on its AI-generated articles will likely divert traffic, sales, and subscriptions from Publishers. *Id.* ¶¶ 120, 126. "[A]ttribution makes users more likely to trust the response they got from Cohere, rather than

causing the user to navigate to the original source." *Id.* ¶ 127. Thus, when Cohere delivers articles "falsely attributed to Publishers," *id.* ¶ 132, consumers will tend to rely on Cohere to access Publisher's articles, "rather than registering with, or subscribing to Publishers, or obtaining content from another licensed source." *Id.* ¶¶ 127–29. Publishers allege that this diversion causes Publishers to "suffer reduced revenue from subscriptions," "reduced revenue from advertising," and "reduced e-commerce revenue." *Id.* The Court may therefore infer that Cohere uses Publishers' marks in commerce by steering customers away from Publishers' websites. *See OBH, Inc. v. Spotlight Mag., Inc.*, 86 F.Supp.2d 176, 186 (W.D.N.Y. 2000) (finding defendant used plaintiffs' trademark in commerce by using the mark to direct customers "to other news-related websites that are in direct competition with plaintiffs in providing news-related services over the Internet").

Cohere's counterarguments are unmoored from case law.

*First*, Cohere argues that Publishers do not plead "use of [Publishers'] marks in the real world with a real person." Mot. 19. This is not the standard. It is settled that investigators' purchases can establish trademark infringement. *Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 82 F.Supp.2d 119, 124 (S.D.N.Y. 1999) (collecting cases); *Pearson Educ., Inc. v. Labos*, 2019 WL 1949820, at *1–2, *5 (S.D.N.Y. Apr. 23, 2019) (McMahon, J.) (relying on evidence that defendant sold infringing goods to "Plaintiffs' counsel, through their investigator"). Cohere cites no case holding that delivering infringing material to investigators is not commerce. Cohere's reliance on *OffWhite Prods., LLC v. Off-White LLC*, is also flawed, cherry-picking a quote on confusion, not use in commerce. *See* 480 F.Supp.3d 558, 566 (S.D.N.Y. 2020). At base, Cohere disputes whether its use is widespread, as Cohere admits it might be if Cohere had "hundreds of millions of users." Mot. 19. But use in commerce does not hinge on volume, and "[t]he extent to which [Cohere] used [Publishers'] marks is a factual issue that is better examined after the completion of discovery."

19

*Adecco USA, Inc. v. Staffworks, Inc.*, 2021 WL 2593304, at *18 (N.D.N.Y. June 23, 2021).

**Second**, Cohere argues that it does not use Publishers' marks in connection with a product or service. Mot. 19–20. But delivering AI-generated responses to customers who pay to use its models is a service under any reasonable interpretation. Like "commerce," "[t]he term 'services' has been interpreted broadly" under the Lanham Act. *United We Stand*, 128 F.3d at 89–90. To use a mark in "connection . . . with services," it is enough that a defendant uses a mark "in public communications in which [it] also highlighted [its] own business ventures." *Portkey Techs. Pte Ltd. v. Venkateswaran*, 2024 WL 3487735, at *8–9 (S.D.N.Y. July 19, 2024). Cohere does just that by sending outputs branded with Publishers' marks to enterprises, trial users, and whomever else.

Cohere asserts that it does not provide a product or service by delivering AI outputs, because it sells "API access" that is "output agnostic." Mot. 19–20. Cohere adds that its models' responses are "communicative output" that are not sold à la carte, but rather are sent to consumers en masse by operation of "the LLM-based tools [Cohere] makes for the enterprise market." Mot. 19–20. To support the supposed relevance of these distinctions, Cohere cites one case: *1-800-Contacts, Inc. v. WhenU.Com, Inc.* (*WhenU.Com*), 414 F.3d 400 (2d Cir. 2005). It is inapposite.

In *WhenU.Com*, the defendant sold software that generated "contextually relevant advertising" in a separate pop-up window when a computer user queried search engines or navigated to websites; WhenU's computer-generated ads appeared when a user searched for plaintiff's trademark or visited plaintiff's website, but the ads themselves did not contain the plaintiff's mark. *Id.* at 400–03, 405–06, 410. Nowhere did the *WhenU.Com* court conclude that a pop-up ad generated by defendant's software was "not itself a commercial product or service" or that defendant did not use plaintiff's mark in commerce because its pop-up advertisements were "communicative output." *See* Mot. 19–20. The claim failed because "under the plaintiffs'

allegations, the defendant did not use, reproduce, or display the plaintiff's mark *at all*." *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127–28 (2d Cir. 2009) (analyzing *WhenU.Com*); *accord WhenU.com*, 414 F.3d at 408. Here, Publishers allege that Cohere puts Publishers' trademarks on its own articles that it displays to consumers. Compl. ¶¶ 118–21. *WhenU.com* does not apply. *See Rescuecom*, 562 F.3d at 129 (finding use in commerce when defendant "displays" plaintiffs' mark).

**Third**, Cohere contends that the outputs its model generates cannot "make a difference to [the consuming public's] decision to purchase a product" and thus are not used in commerce. Mot. 20. This is easily rejected. As explained above, the Command model's value lies in the outputs it delivers—and Publishers' brands "shore up the authority of its responses." Compl. ¶ 76. When Cohere's outputs include Publishers' trademarks, indicating that the generated article originates with one of Publishers' respected publications, consumers are "more likely to trust the response they got from Cohere," *id.* ¶ 127, and view the Command models as worth paying for, *id.* ¶ 146.

Cohere's remaining authorities, which it relegates largely to a footnote, Mot. 21 n.10, are inapplicable. In *DFO Global*, the court found no use in commerce when plaintiffs failed to plead defendants' trademark use in connection with *any* business venture, "prevent[ing] the Court from inferring what, if anything, [defendants] used the [mark] to do." *DFO Glob. Performance Com. Ltd. (Nev.) v. Nirmel*, 2021 WL 3475596, at *9 (S.D.N.Y. Aug. 6, 2021). In *Lopez v. Bonanza.com, Inc.* and *Franklin v. X Gear 101, LLC*, the defendants provided online platforms and web-hosting services through which third-party companies sold infringing merchandise. *Lopez*, 2019 WL 5199431, at *8 (S.D.N.Y. Sept. 30, 2019); *Franklin*, 2018 WL 3528731, at *10 (S.D.N.Y. July 23, 2018). In *Baiul v. NBCUniversal Media, LLC*, a case decided on summary judgment, plaintiff contended that defendants used her name and likeness in a webpage, an email, and a press release. 2014 WL 1651943, at *13–14 (S.D.N.Y. Apr. 24, 2014). The "in commerce" requirement was not

met because there was "no evidence that defendants owned, operated, or were affiliated with" the offending website, that defendant's email was ever opened, or that the press release was ever made available to the public. *Id.* at *10, *12–13. In contrast, Publishers plead that Cohere *itself* uses Publishers' marks, which more than suffices under this Circuit's law.

**B.    Cohere's passing off is not nominative fair use.**

Cohere's behavior does not implicate nominative fair use. "Nominative use is a 'use of another's trademark to identify, not the defendant's goods or services, but the plaintiff's goods or services. It is called 'nominative' use because it 'names' the real owner of the mark." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 165 (2d Cir. 2016) (quoting MCCARTHY § 23:11)). Publishers allege that Cohere provides its fake articles but uses Publishers' trademarks to identify Publishers as the source. When Cohere places Publishers' valuable marks on *Cohere*'s hallucinated articles, Cohere does not "accurately" describe "the relationship between [Publishers'] and defendant's products or services." *Id.* at 168.

Cohere claims its use is "nominative" because it only "reproduc[es] the mark[s] to identify the content that a user requests." Mot. 24. That isn't true. The response "Cohere does not have access to the Fort Worth Star-Telegram article you requested" would use the Fort Worth Star-Telegram mark only as necessary to identify the branded content that the user requests. That response does not state or imply that Cohere's outputs are in any way connected to Publisher McClatchy and would be nominative fair use. But Cohere's actual response—"Here is the article from the Fort Worth Star-Telegram," followed by a hallucinated article generated by Cohere containing "fictitious details about the requested article and its subject matter," Compl., Ex. D, at 4—is not. That response, and the others in Complaint Exhibit D, misrepresent Cohere's own goods or services as someone else's. In other words, Cohere's response is run-of-the-mill passing off.

Cohere argues that falsely representing its own articles as Publishers' "has no bearing on

the nature of the use, which is simply to identify." Mot. 24. Under that flawed logic, any company could use the Chanel mark on handbags, provided its use was "simply to identify," albeit "incorrectly." *But compare Chanel, Inc. v. RealReal, Inc.*, 449 F.Supp.3d 422, 438–40 (S.D.N.Y. 2020) (finding nominative fair use when reseller used Chanel marks in connection with genuine Chanel goods), *with id.* at 440–42 (finding infringement when same defendant sold "counterfeit Chanel products" using Chanel marks). As to both handbags and articles, consumers have a right not to be misled. Nominative fair use does not permit Cohere's blatant passing off.

### C.    Publishers allege that Cohere's use is likely to confuse consumers.

Likelihood of confusion, like the extent of a defendant's use in commerce, "is a factual question" generally unsuited for resolution on a motion to dismiss. *See Champion v. Moda Operandi, Inc.*, 561 F.Supp.3d 419, 437 (S.D.N.Y. 2021) (McMahon, J.). Here, Cohere's claim that Plaintiffs do not plausibly allege a likelihood of confusion fails.

### 1.    Cohere's use of Publishers' trademarks is likely to cause source confusion.

Because Cohere identifies its own goods and services with marks identical to Publishers' marks (*i.e.*, counterfeit marks), its use is "inherently confusing" as to source. *C=Holdings B.V. v. Asiarim Corp.*, 992 F.Supp.2d 223, 241 (S.D.N.Y. 2013). In such cases, courts need not march through factors in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961), to find confusion likely. *E.g.*, *Coach, Inc. v. Allen*, 2012 WL 2952890, at *7–8 (S.D.N.Y. July 19, 2012) (McMahon, J.). In any event, those factors—(1) the strength of plaintiff's mark, (2) the similarity between the parties' marks, (3) the competitive proximity of the parties' products, (4) the likelihood that plaintiff will "bridge the gap" by offering a product like defendant's, (5) evidence of actual confusion, (6) defendant's good faith, (7) the quality of defendant's product, and (8) buyer sophistication—favor Publishers. *See Polaroid*, 287 F.2d at 495.

Publishers' marks are exceptionally strong after decades of widespread, exclusive use, and

the marks are associated with high-quality, award-winning journalism. Compl. ¶¶ 42–59. Cohere's outputs are shoddy and inaccurate but bear marks indistinguishable from Publishers' marks. *See id*. ¶¶ 119, 132. When Cohere distributes news articles online, it competes in the same market that Publishers do. *See id.* ¶¶ 3, 11–27, 37, 110, 112, 125–32. Each Publisher distributes their articles online, and several have already licensed their articles to be distributed, with branding guidelines, through Cohere's competitors. *See id.* ¶¶ 5, 11–27, 37, 130. An ordinary news consumer could reasonably be confused about the source of the articles that Cohere's models generate, especially given Cohere's explicit misrepresentations and Publishers' partnerships with other AI companies. *See id.* ¶¶ 36–38. The Complaint alleges that because Cohere's articles include "a fake source, title, and date," readers will struggle to determine that Cohere's output is not "Publishers' real content." *Id*. ¶ 120. Taken together, Publishers allege facts that make confusion plausible. To weigh the evidence and conclude otherwise at this stage would be improper. *See Winfrey*, 717 F.3d at 313.

Cohere ignores most of the *Polaroid* factors. Instead, Cohere focuses on "consumer sophistication" and "actual confusion." *See* Mot. 22. Neither factor makes confusion implausible. "[W]hen, as here, there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion." *Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*, 182 F.3d 133, 143 (2d Cir. 1999). Moreover, a sophisticated newsreader is not necessarily sophisticated for purposes of trademark confusion. *See, e.g.*, *NYP Holdings v. New York Post Publ'g Inc.*, 63 F.Supp.3d 328, 337–38 (S.D.N.Y. 2014) (addressing sophistication of news readers). With respect to actual confusion, Cohere imposes a higher standard on Publishers than the law requires. Evidence of actual consumer confusion is not required, particularly because "[it] can be both expensive and difficult to obtain." *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 44 (2d Cir. 2016) ("[T]he absence of evidence

of actual confusion does not necessarily prove anything.").

Cohere claims without support that its infringing outputs have not reached "a meaningful segment of consumers." Mot. 22. But the frequency of Cohere's infringement does not bear on liability. "The plain language of the relevant statutes does not require that the plaintiff prove that a defendant committed the infringement in any particular amount, or with any amount of regularity." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F.Supp.2d 284, 290 (S.D.N.Y. 2003).

The Court should reject Cohere's attempts to complicate a simple analysis. Cohere uses Publishers' exact trademarks just as Publishers do—on articles distributed online, including via AI chatbots, to individuals and businesses. Publishers easily plead that consumer confusion is likely.

### 2. Cohere's use of Publishers' trademarks is likely to cause sponsorship confusion.

"The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Dall. Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979); *accord Int'l Info. Sys.*, 823 F.3d at 161–63. Many prominent news media organizations, including several Publishers, have entered high-profile agreements authorizing AI companies to display their articles in AI model responses. Compl. ¶¶ 36–38. For instance, as part of a "global partnership" between OpenAI and Axel Springer, OpenAI is authorized to include *Business Insider* and *Politico* articles and authorized summaries in ChatGPT's responses. *Id.* ¶ 37. The Atlantic and Vox Media license their articles to appear in ChatGPT outputs, provided they "include attribution." *Id.* Cohere confusing consumers into believing there are similar partnerships between Publishers and Cohere is trademark infringement.

### <u>CONCLUSION</u>

The Court should deny Cohere's motion to dismiss in full. Alternatively, if the Court dismisses any claim, it should do so without prejudice. *See* Fed. R. Civ. P. 15(a)(2) (providing that leave to amend is freely given); *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011).

Dated: July 2, 2025

Respectfully submitted,

*/s/ Scott A. Zebrak*

Scott Zebrak
Jennifer Pariser
Yunyi Chen
OPPENHEIM + ZEBRAK, LLP
461 5th Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 951-1156
scott@oandzlaw.com
jpariser@oandzlaw.com
ychen@oandzlaw.com

Meredith Stewart
Audrey L. Adu-Appiah
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue NW, 5th Floor
Washington, DC 20016
Telephone: (202) 480-2999
mstewart@oandzlaw.com
aadu-appiah@oandzlaw.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF WORD COUNT COMPLIANCE</u>

Pursuant to Local Civil Rule 7.1(c), the foregoing is set in 12-point Times New Roman font and, according to the word processing program with which it was prepared, contains 8,451 words, excluding the case caption, table of contents, table of authorities, signature block, and required certificates.

*/s/ Scott A. Zebrak*
Scott Zebrak

*Counsel for Plaintiffs*