

June 2, 2026

***Sent via ECF***

Hon. Ona T. Wang
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007

**Orrick, Herrington & Sutcliffe LLP**
222 Berkeley Street
Suite 2000
Boston, MA 02116-3740

+1 617 880 1800

**orrick.com**

**R. David Hosp**
**E** dhosp@orrick.com
**D** +1 617 880 1886
**F** +1 617 880 1801

RE:    *Advance Local Media LLC, et al. v. Cohere Inc.*, Case No. 1:25-cv-1305-CM-OTW

Dear Judge Wang:

Pursuant to Section IV.b of Your Honor's Individual Practices, Cohere respectfully requests a pre-motion conference regarding Plaintiffs' refusal to produce documents concerning Plaintiffs' negotiations and agreements with third-party generative AI companies. In response to Cohere's Request for Production No. 88 (the "Request")[1], Plaintiffs have agreed to produce only executed contracts. They have refused to produce (1) highly relevant communications relating to the negotiation of those contracts; and (2) communications with other third parties with whom a contract has not yet been executed but with whom Plaintiffs have corresponded. This improper limitation prevents Cohere from developing the factual record necessary to support its fair use defense and probe Plaintiffs' allegations of market harm. The parties met and conferred to discuss this issue via videoconference on March 16, 2026, and have continued to discuss this issue via email on April 21 and 24, 2026, but were unable to resolve their dispute.

## I.    The Request Seeks Relevant Information Essential To Cohere's Fair Use Defense and Plaintiffs' Alleged Damages.

Cohere's Request seeks documents that are critical both to Cohere's fair use defense and Cohere's and the Court's ability to assess Plaintiffs' alleged damages. *See* Fed. R. Civ. P. 26(b)(1) (parties are entitled to discovery as to "any nonprivileged matter that is relevant to any party's claim or defense."). Plaintiffs allege that "[i]n recent years as AI models have become more prevalent, a new market has emerged for news, magazine, and digital publishers to license their content to AI developers." Compl. ¶36. They further contend that Cohere's conduct "invades Publishers' emerging business interests in licensing to AI companies." *Id.* ¶131. Consistent with that theory, Plaintiffs devote multiple paragraphs of their Complaint to detailing the numerous training and RAG-related licensing agreements they claim to have entered into with AI companies.

---

[1] Cohere's Request seeks "Documents concerning or constituting any agreement, licensing arrangement, or partnership You entered into with any other AI company, including but not limited to the 'global partnership' between Axel Springer and OpenAI described in Paragraph 37 of the Complaint and the 'agreements' described in Paragraph 38 of the Complaint."



Page 2

*Id*. ¶¶ 34-39.  To test those allegations, Cohere served Request No. 88, which seeks documents concerning Plaintiffs' agreements, negotiations, partnerships, or licensing arrangements with AI companies.  Plaintiffs have refused to produce anything beyond final, executed agreements.  By restricting discovery to a narrow subset of cherry-picked documents, however, Plaintiffs prevent Cohere from probing the very market Plaintiffs claim to be at issue.

### a.    Plaintiffs' AI Partnerships Bear Directly on Cohere's Fair Use Defense.

Cohere's Request targets evidence relevant to Cohere's fair use defense.  The fourth statutory fair use factor assesses the "effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  As the Supreme Court has explained, this factor is "the single most important element" of the fair use analysis.  *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985); *see also Authors Guild v. Google, Inc.*, 804 F.3d 202, 223 (2d Cir. 2015) (characterizing the fourth factor as "of great importance").  In evaluating this factor, courts examine (1) the existence and contours of any alleged market; and (2) both the amount and source of any alleged loss of revenue.  *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 35–36 (2021); *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994) (noting that the fourth factor considers "only traditional, reasonable, or likely to be developed markets" when assessing potential licensing revenues).

Cohere's Request is relevant to both inquiries.  Draft agreements, negotiations, communications, term sheets, and other non-executed arrangements with AI companies constitute quintessential fair use evidence, which bears on how Plaintiffs themselves value their works, whether Plaintiffs view generative-AI uses as market-substituting or market-enhancing, and whether any alleged market harm reflects actual economic loss or Plaintiffs' strategic decisions about if, when, and on what terms to license their works.  *See On Davis v. The Gap, Inc.*, 246 F.3d 152, 166 (2d Cir. 2001), *as amended* (May 15, 2001) (concluding that §504(b) permits an award of actual damages based on the "fair market value of a reasonable license fee"); *Encyclopedia Brown Prods., Ltd. v. Home Box Off., Inc.*, 25 F. Supp. 2d 395, 401 (S.D.N.Y. 1998) (same); *MSTG, Inc. v. AT & T Mobility LLC*, No. 08 C 7411, 2011 WL 841437, at *3 (N.D. Ill. Mar. 8, 2011) ("Documents related to negotiations could shed light on why the parties reached their royalty agreements and could provide guidance on whether some or all of the licenses could be considered a basis for calculating a reasonable royalty between AT&T and MSTG."); *Small v. Nobel Biocare USA, LLC*, 808 F. Supp. 2d 584, 590 (S.D.N.Y. 2011) (reasoning that "the underlying negotiations [of a settlement agreement] are relevant to the calculation of a reasonable royalty using the hypothetical negotiation damages model").  They may also reveal whether the alleged harm is speculative or self-inflicted, and whether the alleged market for AI content licensing actually exists.  *See Oracle*, 593 U.S. at 38 (2021) (cautioning against the "danger of circularity posed" by "considering unrealized licensing opportunities because 'it is a given in every fair use case that plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for licensing the very use at bar'" (quoting 4 Nimmer on Copyright § 13.05[A][4])).



Page 3

By any read of Rule 26, Cohere is entitled to these materials to support its fair use defense. Accordingly, the Court should not allow Plaintiffs to withhold these materials.

### b. Plaintiffs' AI Partnerships Bear on Plaintiffs' Alleged Damages.

Documents responsive to the Request are separately relevant to Cohere's and the Court's ability to assess Plaintiffs' alleged damages. Plaintiffs' damages claim relies on a market harm theory, which posits that Cohere's alleged conduct frustrated Plaintiffs' ability to seek content licensing opportunities. Compl. ¶¶3,129-131. When faced with market harm theories of this kind, Courts routinely find relevant, and therefore discoverable, materials that bear on a Plaintiffs' licensing opportunities, including both executed deals *and* unconsummated opportunities. This makes sense; after all, few things are more relevant to alleged licensing opportunities than documents related to licensing opportunities.

Unsurprisingly, then, this Court has already recognized that "[d]iscovery" related to damages theories of this kind "would consist of *documents concerning licensing discussions*," not merely finalized contracts. *See New York Times Co. v. Microsoft Corp.*, 757 F. Supp. 3d 594, 598 (S.D.N.Y. 2024) (emphasis added); *see also In re OpenAI, Inc., Copyright Infringement Litig.*, No. 23-CV-08292, 2025 WL 1652110, at *4 (S.D.N.Y. May 30, 2025) ("The Times has already agreed to produce documents relevant to the evaluation of whether a 'viable market' exists for licensing the rights to its works for the purpose of developing generative AI," including "*communications related to executed and contemplated agreements* to license Times works to train and operate generative AI models.") (emphasis added).

Unlike The New York Times, Plaintiffs here have refused to produce anything other than their final, executed licensing agreements. Their position is in flat conflict with black letter law.

### II.    The Request Is Not Unduly Burdensome.

Finally, Cohere's Request is not unduly burdensome or disproportionate to the needs of this case. Cohere's Request is anchored to Plaintiffs' allegations, seeks a defined set of materials directly relevant to core issues of damages and fair use, and can be satisfied through standard searches or readily accessible repositories. Having alleged infringement of thousands of copyrighted works and exposed Cohere to potentially massive statutory damages, Plaintiffs cannot avoid the discovery necessary to test their claims. As courts in this Circuit have long recognized, where so much is at stake, the costs of responding to targeted discovery are not undue. *See Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 321 (S.D.N.Y. 2003) ("A response to a discovery request costing $100,000 sounds (and is) costly, but in a case potentially worth millions of dollars, the cost of responding may not be unduly burdensome.").



Page 4

For these reasons, Cohere respectfully requests that the Court grant its motion and compel Plaintiffs to produce all documents and communications relating to their licensing negotiations with other AI companies.

Sincerely,

*/s/ R. David Hosp*
R. David Hosp